CHARLES H. THURSTON *vs.* FRANK H. HAMBLIN & others.

Suffolk.    March 16, 1908. — May 22, 1908.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Net Profits.   Contract,* Construction.    *Equity Jurisdiction,* For an accounting.
*Interest.    Words*, "Net profits."

The net profits of an enterprise consist of the clear gain of the venture after deduct-
ing from the net value of all assets on hand the capital invested in the business
and all outstanding liabilities.

In a suit in equity by the inventor and patentee of a certain kind of hooks against
the manufacturers of the hooks, for an accounting under a contract in writing
between the plaintiff and the defendants, by which the plaintiff gave to the
defendants the exclusive right to manufacture and sell the hooks and the de-
fendants agreed to employ the plaintiff and pay him $20 a week during the
continuance of the agreement, the contract provided that the defendants should
pay to the plaintiff " one half of the net profits realized from the manufacture
and sale of said improved wardrobe and other hooks made under this agree-
ment, said profits to be computed and paid quarterly during the months of
January, April, July and October in each year." *Held,* that under this agree-
ment the plaintiff was not entitled to one half of the net profits of any one
quarter considered by itself regardless of whatever losses might have been sus-
tained in previous quarters, but that at the end of each successive quarter
the plaintiff was entitled to one half of any net profits of the whole enterprise
down to that time that then remain undivided, and that, if at the end of any
quarter there were such net profits to be divided, the plaintiff's right to one half
of such net profits vested and his share then realized was not to be cut down or
diminished by any subsequent losses.

In a suit by the inventor and patentee of a certain article against the manufac-
turers of the article, for an accounting under a contract in writing between the
plaintiff and the defendants, by which the plaintiff gave to the defendants the
exclusive right to manufacture and sell the article and the defendants agreed to
employ the plaintiff and pay him $20 a week during the continuance of the
agreement, and also agreed to pay to the plaintiff one half the net profits real-
ized from the manufacture and sale of the article, to be computed and paid
quarterly, the defendants are not entitled to charge interest upon the amount of
money advanced by them in carrying on the business.

BILL IN EQUITY, inserted in a common law writ of the
Superior Court dated July 10, 1900, against Frank H. Ham-
blin, William T. Russell and the Hamblin and Russell Manu-
facturing Company, a corporation, for an accounting for one
half the net profits realized from the manufacture and sale by
the defendants of certain improved wardrobe and other hooks
invented and patented by the plaintiff under the terms of an

agreement in writing between the plaintiff and the defendants Hamblin and Russell dated October 31, 1887.

The contract referred to was as follows:

" This agreement made the Thirty-first day of October 1887 between Charles H. Thurston now of Boston in the County of Suffolk and State of Massachusetts, party of the first part, and Frank H. Hamblin and William T. Russell doing business in the City of Worcester and State aforesaid, parties of the second part

" Witnesseth:

" That whereas the said party of the first part owns the exclusive right to manufacture improved wardrobe and other hooks, under letters patent of the United States dated October 11th 1875 and numbered 168,682, and October 7th 1884 numbered 306,294, and

" Whereas said party of the first part has applied for other letters patent of the United States for certain improvements in wire suspension hooks said improvements relating to a direct brace and ' hollow hemispherical or concave-convex enlargement' which application is now pending.

" Now therefore the said parties have agreed as follows: First the party of the first part hereby gives to the parties of the second part, their legal representatives, the sole and exclusive right to manufacture and sell to the ends of the terms of the letters patent aforesaid, also to the end of the term of the letters patent, if granted, application for which is now pending, as before specified, wardrobe and other hooks containing the patented and to be patented improvements, subject to the conditions hereinafter named.

" Second. The parties of the second part agree to employ the party of the first part and to pay him at the rate of not exceeding twenty dollars per week during the continuance of this agreement.

" Third. The parties of the second part agree to furnish the capital necessary to build six threaders and the requisite number of benders for making said improved hooks and to supply the material and labor required in commencing the business.

" Fourth. The parties of the second part agree to pay to the party of the first part his legal representatives one half of the

net profits realized from the manufacture and sale of said improved wardrobe and other hooks made under this agreement, said profits to be computed and paid quarterly during the months of January, April, July and October of each year.

" Fifth.   The said parties of the second part agree to keep separate books of account, and expenses of manufacture and sale of said improved hooks, *including all expenses of the business,* which books shall be at all reasonable times open for the inspection of said party of the first part and his legal representatives.

" Sixth.   In case the said parties of the second part desire to discontinue the manufacture and sale of the improved hooks herein contemplated, they may at their option terminate this agreement by paying to the said party of the first part whatever may be due him at the time as wages for his services and by reconveying to him whatever rights are held by them by virtue hereof.

" Seventh.   The party of the first part agrees to execute and deliver to the parties of the second part any further instrument or instruments in writing deemed by them necessary to enable them to hold and to enjoy the exclusive right to manufacture and sell said improved hooks under the letters patent herein named and applied for according to the true intent and meaning of these presents.

" In Witness Whereof the said parties have hereunto set their hands and seals the day and year first above written.

" Frank H. Hamblin          (Seal)

W. T. Russell          (Seal)

Chas. H. Thurston "          (Seal)

The case was referred to Stephen H. Tyng, Esquire, as master.   He filed a report in which he found that the defendants Hamblin and Russell owed the plaintiff $11,534.65.

In the Superior Court the case was heard upon the defendants' exceptions to the master's report by *Fox*, J., who filed the following memorandum of decision :

" Oct. 31, 1887, the plaintiff, an inventor, made an agreement with the defendants who are manufacturers, under which the defendants were to manufacture and sell the plaintiff's patented articles and give him half the profits arising from the manufac-

ture and sale. The clause relating to the division of profits is as follows: 'Fourth. The parties of the second part agree to pay to the party of the first part one-half of the net profits realized from the manufacture and sale of said improved wardrobe and other hooks made under this agreement; said profits to be computed and paid quarterly during the months of January, April, July and October of each year.' This agreement remained in force from 1887 to 1900. During all this time the plaintiff was in the defendants' employ, drawing $20 a week as wages, but there was never any estimation or division of the profits, the defendants contending that none were earned. The master on page 12 of his report says that it is impossible for him to determine whether for the entire period the business was run at a loss or not. In spite of this declaration he awards to the plaintiff $11,534.65 as his share of the profits with interest earned during this period. I am unable to accept this conclusion for several reasons.

" 1. The master apparently proceeds upon the assumption that if the business for any single quarter was profitable, the plaintiff was entitled to a share of the profit of that quarter, even though that profit did not make good the losses of the preceding quarters. For example, if the business lost $500 in each of the first three quarters of the year and gained $500 in the last quarter, the plaintiff was entitled to have $250 as his share of the profit for that quarter, and leave the defendants to bear the entire loss of $1,500. I am of the opinion that the plaintiff was not entitled to any share of the profit until the business showed a profit, and that it could not show a profit until it showed a surplus above the investment. It may be true that the plaintiff's right to a profit once earned could not be cut down by subsequent losses, but it does not appear that there was any time during the entire thirteen years when the receipts and stock and machinery on hand exceeded the outlay.

" 2. The master finds that there was a profit in sixteen quarters, scattered through the thirteen years, and he rests this finding upon an account submitted by the defendants' experts and annexed to his report, 'Exhibit A.' This has a column of expenses by quarters and a column of sales by quarters. In any quarter in which the sales exceed the expenses that excess

is put down in a third column marked 'Surplus,' and whenever the expenses exceed the sales, that excess is put in a column headed 'Deficit.' The account, therefore, simply shows that during certain quarters the receipts exceeded the expenses, and during other quarters the expenses exceeded the receipts. For example, for the quarter ending Jan. 1, 1889, the receipts were $1,229.37 and were $549 less than the expenditures. For the quarter ending April 1, 1889, the receipts were $2,536.04 and exceeded the expenditures by $216.53. The only natural inference from these figures is that goods were manufactured in one quarter and sold in the next. It would clearly be impossible from this account to infer either that the concern lost money in one quarter or made it in the next quarter. No estimate of profits could be made without at least a stock-taking, and the report shows there was no stock-taking from the beginning to the end of the business.

"3. The master finds that there was on hand at the close of the business machinery, tools and stock to the value of $8,994.95. From this sum he deducts $3,000 as capital advanced by the defendants, and finds that the plaintiff is entitled to one-half the remainder or $2,997.47, and this sum he includes in his award in the plaintiff's favor. There is no evidence that the plaintiff ever put any money into the business, and there is no theory upon which the plaintiff can be entitled to a division of the property on hand at the close of the business unless that property represents undivided profits. In view of the statement of the master already referred to, that he is unable to say whether the business was run at a loss or not, even when the inventory is taken into account, it is difficult to see on what ground this award was made.

"The master, however, is right in holding that the defendants are not entitled to charge interest upon the capital advanced by them in carrying on the business. See *Rishton* v. *Grissell*, L. R. 5 Eq. 326. Apparently, even upon the account submitted by the defendants and annexed to the master's report, if interest be deducted and if the inventory be taken into account (as it should be) a surplus would be shown, and although the exceptions to the master's report, so far as they are covered by the foregoing memorandum, must be sustained, the case will be retained in

order that the plaintiff may if he desires file a motion for the reopening of the case.

"The question whether the plaintiff is entitled to interest on profits need not be considered until it appears that there was a profit. The plaintiff, however, made no demand for an account until 1899. He had access to the books and knew that there had never been any stock-taking; that the books contained simply an account of moneys received and expended and no sufficient data for estimating the profit, if there was any. If upon recasting the account a profit is shown, it seems that interest upon that profit should be computed from 1900. *Rishton* v. *Grissell,* L. R. 10 Eq. 393.

"The fourth, sixth and eleventh of the defendants' exceptions are sustained. The rest are overruled except as above indicated."

The judge made a final decree that the master's report be confirmed except as appeared by the memorandum filed in the case; that upon the facts found by the master it did not appear that the plaintiff was entitled to recover any sum of money from the defendants, and, since the plaintiff had filed no motion for a reopening of the case pursuant to leave granted, that the bill be dismissed. From this decree the plaintiff appealed.

The defendants' fourth, sixth and eleventh exceptions to the master's report sustained by the judge were as follows:

"4. (Based on objection numbered 4.) The defendants except to the ruling, because under the contract there could be no ' net profits ' in any quarter until the expenses of that quarter and the unpaid debts of the business for previous quarters were paid."

["Fourth: The defendants object to the last paragraph . . . as it is an erroneous construction of clause 4 of the contract, if the master intended to rule that the business of each quarter should be considered apart and distinct from the business of every other quarter and that 'at the expiration of each quarter when there was a profit the plaintiff became immediately entitled to one half thereof, and that his right thereto would not be divested by reason of any losses accruing in any' quarter or quarters immediately preceding that particular quarter, because 'net profits' mean the clear gains of the business as a whole up

to that time when a computation is made to ascertain its condition, that is, there could be no 'net profits' until the debts of the business had been paid or the deficit of the immediate preceding quarter or quarters had been wiped out."]

"6. (Based on objection numbered 7.) The defendants except to the finding, as erroneous, because the old ledger does not show a single instance of a quarterly accounting such as adopted by the master, but it does show that in every quarter where a balance was struck, there was also taken into consideration the balance whether debit or credit, of the immediately preceding period."

["Seventh: The defendants object to the first sentence of the last paragraph on page 5, 'I find that there was no such abandonment of quarterly accounting in the books of the company as to justify the finding that the parties adopted another or annual scheme in lieu thereof,' as plainly wrong, if the master meant by the words 'quarterly accounting' such a method of accounting as he has adopted, for no such quarterly accountings are shown of the books, but on the other hand they do show that whatever quarterly balances were struck, that balance was carried forward into the next succeeding period and taken into account therein."]

"11. (Based on objection numbered 12.) The defendants except to the statement that 'the tabulation of the defendants' expert shows profits in certain quarters,' because the tabulation does not show any profits but only that the sales of goods made during certain quarters, regardless of when they were manufactured, exceeded the expenses of those quarters, thereby resulting in surpluses which were applied to the cancellation of the due and unpaid debts of the business."

["Twelfth: The defendants object to the finding, 'In said account rendered by defendants' expert profits are shown in sixteen of the quarters accruing during the period from November 1, 1887 to January 1st, 1900. These profits aggregated $7,879.73," as the account rendered by the defendants' expert does not show any 'net profits' in any quarter, but simply that the sales of goods made during that quarter, regardless of when they were manufactured, exceeded the expenses of that quarter, thereby resulting in surpluses in certain quarters."]

*C. C. Mellen*, (*H. E. Fales* with him,) for the plaintiff.

*M. H. Browne*, (*J. M. Browne* with him,) for the defendants.

SHELDON, J. The first question in this case is raised upon the plaintiff's claim that he was entitled to one half of the profits that might be made in any one quarter regardless of whatever losses might have been sustained in previous quarters. The result of this contention, if sustained, would be that if, after an unbroken series of losses sustained throughout many successive quarters, some profits finally should be realized in any one quarter considered by itself, he would become at once entitled to receive one half of such profits as a net gain, while the defendants would have to apply their share in the profits of such special quarter towards reimbursing themselves for their previous losses. The manifest result of this construction under any probable state of affairs would be to give to the plaintiff a much larger share of the profits than would be received by the defendants, and in the events that have happened might give the plaintiff a large profit and leave the defendants to bear a large loss. The agreement cannot be so construed. The words "net profits" in the fourth clause of the agreement relied on, "to be computed and paid quarterly . . . in each year," must be taken in the ordinary acceptation of those words, to mean whatever net profits have then accrued from the business since its beginning, or since the last division of such net profits. These net profits would be substantially represented at any one time by the amount of the receipts from the business, the sums due for goods sold, and the value of stock, materials, tools and plant on hand, less the amount of the investment, of payments made or liabilities incurred for expenses, and any losses sustained by reason of bad debts or otherwise. In other words, they would be what should remain as the clear gain of the venture, after deducting from the net value of all assets on hand the capital invested in the business and all outstanding liabilities. *Park* v. *Grant Locomotive Works*, 13 Stew. (N. J.) 114, 121. It is to one half of these net profits computed at the end of each successive quarter that the plaintiff is entitled. And as the plaintiff's right to this amount would become vested at the end of each quarter when, so reckoned, there were any net profits to be divided, and the amount so due to him should have been paid to him at once, it follows that his

share of any net profits once realized, is not to be cut down or diminished by the amount of any subsequent losses. This was the doctrine of *Hitchings* v. *Ellis*, 12 Gray, 449. Accordingly the defendants' fourth and sixth exceptions to the master's report were properly sustained.

But it may be that the defendants' eleventh exception should not have been sustained. It is true that the defendants' tabulation did not show actual profits in any quarter, or anything more than that the sales of goods in certain quarters exceeded the expenses of those quarters. But the defendants' books had been ill kept, and were found to be erroneous and not wholly trustworthy, and did not furnish sufficient data for ascertaining the true state of the accounts. They do not appear to have indicated the value of the stock or plant on hand at the end of the respective quarters. It may be that they included, at any rate the master might have found that they included, in the column headed "Expenses" the amounts ($3,000 in all) advanced by the defendants as capital of the business. But this table, incomplete and somewhat inaccurate as it was, was presented by the defendants as a statement of the whole result of the business. It was the evidence upon which they largely relied to sustain their contention that the expenses of the business had exceeded its receipts, and so that there were no net profits. *Wisconsin Sulphite Fibre Co.* v. *D. K. Jeffris Lumber Co.* 132 Wis. 1. As against them, and in view of the fact that the table which they put in evidence did not purport to measure the success of the business and to determine the time when, if ever, it should be considered that net profits had been realized or to ascertain the amount of such net profits in any other way than by comparing expenses with receipts, we are of opinion that the master was warranted in finding that the tabulation of the defendants' expert did show profits in certain quarters, if, after correcting the statement of the expenses by making proper deductions for interest erroneously charged, he found that there were any quarters in which the receipts were greater than the amount of the expenses of that month and the deficits of the preceding months. Whether this should be found, depended upon a calculation which we have not, upon the master's report, the means of making.

We agree with the ruling of the Superior Court that the defendants were not entitled to charge interest upon the amount advanced by them in carrying on the business. *Rishton* v. *Grissell*, L. R. 5 Eq. 326.

We are inclined to the opinion, upon the facts which are stated in the master's report and the tables which are annexed to it, that a full statement of the account as rendered by the defendants, with proper corrections for the charges of interest made by them and with the correction that would be further required if it should turn out upon fuller investigation that the sum of $3,000 advanced by the defendants for capital of the business had been included in the tabulation of expenses put in by them and so should not again be charged in the final statement of the account, might show a small balance in favor of the plaintiff. We have not however before us sufficient data for determining these questions. Ordinarily, under such circumstances the case would be recommitted to the master to state the proper account. But the defendants do not desire this; and as the plaintiff has failed to avail himself of the permission given to him by the Superior Court to ask to have this course adopted, we must infer that he also does not desire it. It cannot be said to appear now that the plaintiff is entitled to recover anything from the defendants; and the decree of the Superior Court must be affirmed.                                     *So ordered.*