FRANK EDWARDS *vs.* FRANCIS WILLEY & others.

Suffolk.    October 5, 6, 1914. — December 29, 1914.

Present: RUGG, C. J., LORING, SHELDON, DE COURCY, & CROSBY, JJ.

*Contract,* For division of profits, Construction, Modification. *Interest. Waiver. Evidence,* Illustration by supposititious case. *Practice, Civil,* Conduct of trial: requests, rulings and instructions; Exceptions.

Under an agreement for sharing the profits of an enterprise between one who advances the capital and another who does the work in carrying it on, no interest on the capital furnished is to be allowed, in the absence of an express stipulation upon the matter.

A firm, engaged in England in the purchase and sale of wool throughout the world, by an agreement in writing appointed a man in Boston their agent for the sale and purchase of wool in the United States and Canada and agreed that, in addition to a certain fixed salary, he should "receive a bonus of five per cent on the net profits realized from the sale and purchase of wools by" the firm, and that, in "ascertaining the realized profits on wool before mentioned . . . the actual cost price shall be taken at the time the consignment is made or transaction entered into, and all actual expenses" added thereto. By the

course of business the firm avoided making cash advances in respect to their purchases made abroad by drawing on themselves drafts to be paid at the point of destination of the goods, which were discounted by local banks at the place of purchase abroad. It also was necessary, according to an English custom, for them to pay half a crown per £100 on checks drawn upon their banks in England. *Held,* that in determining "the actual cost price" of the wool "at the time the consignment" was made, for the purpose of computing the share of the profits to be paid to the agent, neither interest upon the capital invested in making the purchases, nor the interest paid by way of discounts, nor the sums charged to the firm for their checks should be considered.

In an action by an American agent of an English employer, after his discharge by his employer, for a share of his employer's profits due to him under the terms of an agreement in writing, where it appears that the agent has at all times insisted that interest on the employer's investment should not be charged in computing the profits which he was to share, and his insisting on that contention is found by an auditor who heard the case to have been one of the "moving causes" for the employer discharging him, a letter, written as to one transaction about four years before his discharge, suggesting that such interest should be charged, does not make necessary as a matter of law a finding that the original contract was modified in that particular; nor is such a finding rendered necessary as a matter of law by a statement of an English solicitor employed by the employee, who, when shown, by an accountant procured by the employer to go over his books, a paper containing among other items and charges to be included in the account those which the employee disputed, said merely, "Proceed with the account."

At the trial of an action by an agent against his employer for sums alleged to be due under the provisions of a contract in writing, it appeared that, a dispute having arisen between the parties, the agent wrote a letter to the employer stating that, if the employer would authorize an attorney to receive a certain sum as a final settlement of their account to a certain date, that would "close the controversy as arranged. If not, I shall consider myself free to enter into negotiations with another party. I want your decision per return mail." The employer replied by a letter sent by a messenger, stating that the agent left him no alternative but to accept his ultimatum and thus "terminate at once our business relations," and directed the agent to deliver "the conduct of the business" to the bearer of the letter. The bearer of the letter thereupon demanded a certain sum from the agent. The agent stated that the employer owed money to him, and, counsel for both parties being called to a conference, it was arranged that, pending the making of accounts, the agent should remain in charge of the business and continue to perform his duties, which he had not ceased to do. *Held,* that, if there had been in the correspondence any acceptance by the agent of a termination of the contract, which was not decided, that acceptance was waived by the arrangement made by the agent, the employer's representative and their respective counsel.

A request for a ruling of law, which assumes as a fact a matter as to which the evidence is conflicting, should not be given.

To explain by way of illustration a course of business which is a material issue at a trial, a witness for one of the parties to the action may be allowed, in the discretion of the presiding judge, to describe a supposed transaction, and, if the other party is apprehensive that the bearing of the whole or any part of the answer of the witness may be misunderstood by the jury, he should ask

to have the jury instructed on the point, or, if, after a verdict is returned, it appears that the jury's verdict can be explained only on the ground that such testimony was misapplied, his remedy is by a motion for a new trial.

An objection to a misapplication by a jury of evidence properly admitted cannot be raised in this court on a general exception to the admission of the evidence.

LORING, J. By a letter dated December 1, 1897, the defendant Francis Willey, engaged at Bradford, England, in the purchase and sale of wool throughout the world, (1) appointed the plaintiff his agent for the sale and purchase of wool in the United States and Canada, and (2) agreed that in addition to the fixed salary there stated, "You shall receive a bonus of 5% on the net profits realized from the sale and purchase of wool by my firm . . . so long as you remain my agent only." The letter further stated: "In ascertaining the realized profits on wools before mentioned, of which you will participate to the extent previously set forth, the actual cost price shall be taken at the time the consignment is made or transaction entered into, and all actual expenses deducted therefrom." It is agreed that the words "deducted therefrom" were used by mistake for "added thereto." Later on the plaintiff's share of the net profits was increased, and Francis Willey took on two partners. But it is agreed that if any one of the partners is liable all are to be treated as liable in this action. This letter also provided that the agreement therein made might be terminated by either party giving to the other six months' notice in writing. The plaintiff's contention is that he was wrongfully discharged on July 21, 1908, consequently that he is entitled to a percentage of net profits until January 21, 1909, and it was to recover these profits due the plaintiff from December 1, 1897, to January 1, 1909, that this action was brought. As we understand the record the plaintiff, as matter of convenience in taking the accounts, waived his claim to profits after January 1, 1909.

The case was sent to an auditor,* and later was tried at great length in court.† The plaintiff had a verdict for $154,216.89, substantially the amount found by the auditor with interest from the date of his report. A motion for a new trial made by the defendants was denied in case the plaintiff remitted $83,-

* William S. Dana, Esquire.

† Before *Fessenden*, J.

296.78. After the decision in *Edwards* v. *Willey*, 218 Mass. 363,. that sum was remitted by the plaintiff, and the case is here on exceptions taken by the defendants at the trial.

1. The most important difference between the parties relates to the defendants' right to charge interest on capital in ascertaining the net profits in which the plaintiff is entitled to participate. The defendants contend that they are entitled to include interest and discounts in determining "the actual cost price" of the wool "at the time the consignment" was made to the United States. The presiding judge instructed the jury that interest was not to be allowed unless they found (1) that there was a universal custom to allow interest under such circumstances; or (2), that the parties, by their course of dealing or otherwise, had modified the original contract. In answer to questions put to them the jury stated that no interest, by way of discounts or otherwise, was included by them in the cost of the wool "at the time of shipment." That is to say the jury found that the contract stated in the letter was not modified by custom when made, nor subsequently by the parties through their course of dealing, or otherwise. The question to be decided, therefore, is whether the judge was right in ruling that under the original contract no interest was to be allowed in computing "the actual cost price . . . at the time the consignment" was made. By the course of business pursued by them the defendants avoided cash advances in respect of their purchases made abroad, by drawing on themselves drafts to be paid at the point of destination of the goods. These drafts were discounted by local banks at the place of purchase abroad. When the defendants thus had paid interest by way of these discounts on the purchase price,. they contended that the discounts should be allowed in determining the actual cost price, and that when no discounts had been paid they were entitled to charge interest on the purchase price.

It is established in this Commonwealth and elsewhere that in an agreement for sharing profits made between one who advances the capital and another who does the work (in the absence of an express stipulation upon the matter), no interest on the capital furnished is to be allowed in determining the profits which are to be shared between them. When the profits of an enterprise are to be shared between the employer who provides the capital and

the employee who furnishes the labor, the employer has furnished his capital to get his share of the profits in place of putting his money at interest. He has agreed to furnish the capital to get his share of the profits, and is not entitled to interest on the capital furnished by him in addition to the share of the profits earned by it in putting it into the enterprise. *Thurston* v. *Hamblin,* 199 Mass. 151. *Rishton* v. *Grissell,* L. R. 5 Eq. 326. *Paine* v. *Howells,* 90 N. Y. 660. *Daintrey* v. *Evans,* 148 App. Div. (N. Y.) 275, 277, 278. *Morrow* v. *Murphy,* 120 Mich. 204. *Selz* v. *Buel,* 105 Ill. 122, 130.

No case has been cited and none has come to our attention in conflict with these decisions. The many cases relied on by the defendants do not affect them or the result reached by them. Doubtless interest would be included in determining what the net "profits realized" were, or what the cost or the price, or "the actual cost price" was when those words are used in other connections. But those instances are beside the mark in this case.

The defendants have made the further contention that as matter of law on the evidence the jury were bound to find that the original contract had been subsequently modified both with respect to an allowance for interest on the defendants' capital used by them in making these purchases and as to the discounts actually paid by them on drafts drawn against the wool when shipped from the point of purchase to England. The first of these two contentions is based on a statement in a letter of June 16, 1904, as to several lots of Buenos Ayres wool which had been invoiced to the plaintiff at substantially the price at which they were sold by him. In that letter the plaintiff wrote, "Please add on to the original cost what you consider is right for interest and carrying charges, and the difference between the found cost price and what you have invoiced them to us at, please send us credit note of same." But from the beginning (on the evidence) the plaintiff insisted that interest was not to be charged, and the defendant insisted that it was to be charged; and this difference between the parties was such that the auditor found that "the plaintiff's denial of the defendants' right to such interest as one of the proper charges of the business in ascertaining net profits" was one of the "moving causes of his discharge by the defendants."

It is plain that this question, on all the evidence, was a controverted question of fact, properly left to the jury.

The second contention is wholly without merit. It is based on the following facts: On April 20, 1910, the plaintiff began to take the deposition of one of the defendants' bookkeepers as to the cost of the wool shipped to the plaintiff. The process of getting at this cost by question and answer being slow, the defendants offered to have a chartered accountant on their behalf prepare and submit such an account. Thereupon, before beginning the work necessary to prepare such an account, the chartered accountant submitted to the plaintiff's English solicitor a paper showing the items and charges to be included in the account. The chartered accountant at the trial here in question testified that among the items specified in this paper was "Credit discounts per purchase invoice;" and that thereupon the plaintiff's solicitor said "Proceed with the account." It appeared that the proposed account never was made owing to a controversy as to who should pay for it. If the accountant's testimony is to be accepted as true (and that is more than the defendants were entitled to; see *Lindenbaum* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 314), there is nothing in the contention. All that the English solicitor can be taken to have agreed to was that if the chartered accountant wanted to include those items in the account he was at liberty to do so. It was not and could not be found to have been an agreement binding on the plaintiff that the discounts were a proper item in ascertaining "the actual cost price . . . at the time the consignment" was made.

The first and second rulings asked for by the defendants * were properly refused. We have not found it necessary to consider the plaintiff's contention that the right to charge the discounts paid was not open under this bill of exceptions. We have

---

* The first and second rulings asked for by the defendants were as follows:

"1. Interest is to be computed on the actual cost price of the wools up to the time of shipment to the United States, being the time the consignment is made or transaction entered into.

"2. In computing the actual cost of wools shipped to the United States, the defendants are entitled to have interest computed on the actual cost of the wools up to the time the consignment is made or transaction entered into, namely, up to the time of shipment to the United States."

assumed in favor of the defendants that the point was open. But we make no decision upon that question.

2.   There was evidence that in England it is the custom for banks to charge their depositors half a crown per £100 for checks drawn on the depositor's account.   The defendants asked the judge to rule that all sums charged by their banks on the defendants' checks drawn in the business in question should be included in determining "the actual cost price . . . at the time the consignment" was made.*

The judge instructed the jury that if they accepted this evidence as true the charge was not to be allowed.   The question depends in substance upon the considerations just stated, which forbid the employer to charge interest on capital.   To earn his share of the profits the employer furnishes the capital and attends to the employer's part of the business.   It would be as reasonable for the employer to ask to have a due percentage of the rent of his home office, of his office coal bill, and of his clerks' salaries included in determining "the actual cost . . . at the time the consignment" was made.

3.   The other three rulings asked for by the defendants relate to the time when the contract came to an end.†

---

* The third ruling asked for by the defendants was as follows:

"3. Whatever reasonable amount the defendants actually paid and were required to pay to the Banks for the handling and disbursement of funds used in the purchase of wools subsequently shipped to the United States is to be allowed as a part of the actual expense of the transaction."

† The following were the fourth, fifth and sixth rulings asked for by the defendant:

"4. The plaintiff's letter to the defendant of May 29th, 1908, having stated that if a payment by him of $4,000 was not received in full settlement for all claims to December 31st, 1908, he should consider himself 'free to enter into negotiations with another party,' and adding, 'I await your decision per return mail' and the defendant in his letter of June 19th having refused to accept this settlement, and said that the plaintiff left them 'no alternative but to accept your ultimatum and thus terminate at once our business relations,' and having requested the plaintiff to turn over to Vernon Willey 'the keys of all safes, draws, etc. in the office, together with all documents and securities of every kind of which you are in possession belonging to me or my business, of whatever sort or kind,' the contract between the parties was terminated, and the plaintiff is not entitled either to salary or commissions after July 1st, 1908.

To understand these requests it is necessary to make a further statement of the evidence and facts of the case. There was evidence that during the eleven years next after the plaintiff's employment began there were many differences between the plaintiff and the defendants. A letter dated May 18, 1908, written by the defendant Francis Willey on his way back to England, brought matters to a head. If the plaintiff's story was believed this was a flagrant refusal to abide by an agreement reached by the plaintiff and the defendant in New York on the eve of the defendant's taking ship for England. On receipt of this letter the plaintiff wrote to the defendant under date of May 29, 1908, that he refused to open the final settlement of all matters of accounting between them agreed upon in New York, just before the defendant sailed, namely, that the plaintiff was to pay the defendant $4,000 without interest in final settlement of all matters. The plaintiff ended this letter by stating that if the defendant would authorize his attorney "to receive the $4,000 and give a receipt in your name in full settlement for all claims to Dec. 31, '07 I will give him the check for the same. This will then close the controversy as arranged. If not, I shall consider myself free to enter into negotiations with another party. I want your decision per return mail." On receipt of the plaintiff's letter of May 29, the defendant wrote the plaintiff a letter dated June 19, 1908, which was delivered to him at Boston on June 29, 1908, by Vernon Willey (one of the defendant's partners). In this letter the defendant stated that the plaintiff left him no alternative but to accept his ultimatum and thus "terminate at once our business relations;" and that "the bearer of this letter, Mr. Vernon Willey," would "take over the conduct of the business."

---

"5. The plaintiff is not entitled to salary or commissions after July 1st, 1908.

"6. If the plaintiff knew that the amount drawn by him for the building of the house in 1901 amounted to the sum of about $5,500, and that the defendants supposed the amount to be about $4,000, concealed the' true amount from them and sought to get a release and full discharge of his indebtedness by the payment of the smaller sum without disclosure of the true amount, by his letter and proposed receipt of March 31st, and his letter of May 29th, 1908, the defendants, without more, were justified in terminating the employment."

In addition the defendant charged the plaintiff with bad faith "with regard to the amount you gave me, $4,000 or £800, which you stated to be the correct amount withdrawn for the purpose of building your house." The circumstances as to this were in substance as follows: In the autumn of 1900 the plaintiff had asked permission to borrow of the defendants the money necessary to enable him to build a house. This request was granted. Thereafter the plaintiff drew for that purpose sums amounting in the aggregate to $5,462.49. These sums were included in the regular monthly statements sent by the plaintiff to the defendants. No note was given for this loan, and no separate account of it was opened and no statement of the amount of it was made up. By a letter of November 30, 1907, the defendant asked the plaintiff to pay "the £800 you borrowed some years ago." According to the plaintiff's testimony this was the beginning of the alleged concealment by the plaintiff of the amount of that loan referred to in the sixth ruling asked for by the defendant. He testified that "Except as the items making up the same were included in the monthly statements sent over to the defendants at Bradford in 1901 at the times the moneys were drawn, the plaintiff did not then, or at any time, state the amount that had been drawn." It appeared that the loan was thereafter referred to as a "loan of £800."

The plaintiff testified that when the defendant's letter of June 19 was handed to him in Boston by Vernon Willey on June 29, 1908, Vernon Willey demanded payment of the money borrowed by the plaintiff to build his house, to which he (the plaintiff) answered: "I don't owe you a cent; you owe me for ten years back accounts; I have a contract with your father and he has promised over and over again to carry out this contract and hasn't done it, and I propose to remain here and carry out that contract." That he asked Vernon Willey "if he had brought the back accounts with him," and that "Vernon Willey said he had not brought them." That a meeting was had the next day between the plaintiff, Vernon Willey and their respective counsel, and that it was then "arranged that Vernon Willey should have the accounts made up according to the contract, and when they were ready they were to be brought to the defendants' office in Boston and discussed by the parties, and meanwhile

plaintiff should go back to the office as if nothing had happened and continue his duties there, — which plaintiff accordingly did." The plaintiff further testified that up to the time of this interview "there had been no change in the plaintiff's relation to the defendant firm, and that he had been continuously in its employ;" that "he continued to perform his usual duties for the defendants at the office every day" until July 21, 1908, when Vernon Willey discharged him. In addition the auditor found that "the plaintiff's denial of the defendants' right to such interest as one of the proper charges of the business in ascertaining net profits, his continued demands for the back accounts from Bradford, and his refusal to settle except upon.the payment to him of his share of the net profits as shown by the books and vouchers at Bradford, were the moving causes of his discharge by the defendants."

The ground on which the defendants base their right to the fourth ruling asked for by them is that the plaintiff's letter of May 29, 1908, was a "consentive termination of the contract;" that they accepted it by their letter of June 29, and that in this way the plaintiff's employment came to an end at that time. We do not find it necessary to decide upon the correctness of this contention because there was evidence that the defendants' acceptance (if it was an acceptance) was waived by the arrangement made at the interview between the plaintiff, Vernon Willey and their respective counsel.

This also disposes of the fifth ruling asked for.

In the sixth ruling asked for it is assumed that without question the plaintiff was discharged for concealing the true amount of the loan. This assumption was unwarranted. It is at least doubtful on the evidence whether the jury would have been warranted in making a finding to that effect. Moreover the judge in his charge left this question to the jury as a matter of fact. In his charge to the jury the judge, after telling them that the plaintiff was entitled to profits for six months after he was discharged if it was not terminated because of his taking papers which belonged to the partnership, added: "It is a very simple thing to understand; I don't think I need to dwell on that any longer; perfectly simple, so far as that is concerned. And there are those ways of looking at it. I don't

mean by this that this is all — saying these papers — it is said also that he concealed some matters; didn't disclose the matter with reference to the amount of the loan — you may consider that — on account of the house; you remember that." This ruling gave to the defendants all that they were entitled to in this connection.

4. The next exception is to the ruling of the judge allowing the plaintiff to follow through "a suppositious [supposititious] case" in order to describe the course of business. The plaintiff was allowed to suppose that the defendants had five hundred bales of wool coming to Boston, and then to trace the five hundred bales of wool from the defendants in Bradford to the customer in America and show how the profit was put on it. In answer the plaintiff said in substance: We will take the price at twenty cents a pound. When it arrives in Boston we pay duty of eleven cents which, added to the price of twenty cents, makes thirty-one cents a pound; then we add a cent and a half for freight and charges, making thirty-two and a half cents a pound; then a profit of two cents (equal to ten per cent of the cost in Bradford) would be added, making a price of thirty-four and a half cents to the customer. What the defendants complain of in this connection is that in this way the plaintiff was allowed in effect to testify that the defendants made a profit of ten per cent on the price of all wool shipped to America. And they have undertaken to argue, by a laborious analysis of the case, that the verdict shows that this evidence was so treated by the jury. The defendants cannot contend, and indeed they have not contended, that the question was not proper for the purpose for which it was offered. If they had been apprehensive at the trial that though admissible for the purpose for which it was admitted its bearing would be misunderstood by the jury, they should have asked to have the jury instructed on the point. But they did not do that. If on the coming in of the verdict it appeared, as the defendants now contend, that unless this evidence had been treated by the jury as testimony to the amount of profit actually made by the defendants there was no basis for the verdict found by the jury, their remedy was by a motion for a new trial. But that is not a consideration which can be urged in arguing an exception taken to the admission of the evi-

·dence. The evidence was admissible, and this exception must be overruled.

The entry must be

*Exceptions overruled.*

*S. J. Elder,* (*A. H. Russell* & *E. M. Moore* with him,) for the defendants.

*F. H. Stewart,* (*W. H. Rand, Jr.,* with him,) for the plaintiff.