## DAVID STEIN *vs.* STRATHMORE WORSTED MILLS.

Middlesex.   November 19, 1914. — May 20, 1915.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & CROSBY, JJ.

*Contract,* Construction.   *Evidence,* Opinion: experts.   *Words,* "Net profits."

Where a person employed as the representative and selling agent of a manufacturing corporation was to receive as his compensation a certain sum of money a year and a percentage of the net profits, it was *held,* that the "net profits" would be the difference between a sum made up at the end of the year of the receipts from the business during the year, the amounts due for goods sold, and the value of all stock, materials, machinery, tools, real estate and plant on hand, and another sum made up of the value of all similar physical items at the beginning of the year, of all payments made and liabilities incurred for expenses, and of losses sustained during the year by bad debts or otherwise.

Where, for the purpose of ascertaining the net profits for a certain year of a corporation manufacturing textile products in order to determine the compensation which a selling agent was to receive in the form of a percentage of such net profits, a valuation of the buildings, machinery and like physical property of the corporation at the end of the year must be made, there must be an allowance for depreciation during the year.

In the absence of any definite evidence to the contrary, it cannot be said as a matter of law that a computation of the depreciation during a certain year of the buildings, machinery and other like physical property of a corporation manufacturing textile products by taking the book value of the plant, representing its cost value, and adding to it the actual expenditures for new construction and deducting six per cent upon that total, is wrong.

In computing the net profits during a certain year of a corporation manufacturing textile products, it is right to allow as expenses the amounts actually expended for repairs and maintenance of the plant, this being a separate matter from the allowance made for depreciation.

In a suit in equity against a corporation manufacturing textile products to recover for services of the plaintiff for which the defendant agreed to pay by a percentage of its net profits, where in computing the net profits it is necessary to make an allowance for depreciation of the plant and a master has found that in business like that carried on by the defendant depreciation usually is reckoned by deducting a percentage from the cost value of the plant, the master in the exercise of his discretion properly may find that a witness is qualified to express an opinion as to the ratio of depreciation, if it appears that the witness has been the assistant treasurer of the defendant for two and a half years, that his experience has been mainly that of an accountant, that he previously had worked in the statistical department of an insurance company and in the banking business and for four years had to do with the books of four large worsted mills and knew of their practice as to the charging off of depreciation, that he is familiar with the real estate and plant of the defendant and has made a study of

depreciation, and if also the witness has been subjected to a lengthy cross-examination as to his method of and reasons for arriving at the ratio of depreciation in which he has exhibited some intelligence respecting the subject and during which the master has had an opportunity to observe his appearance upon the witness stand.

In a suit in equity against a corporation manufacturing textile products to recover for services of the plaintiff for which the defendant agreed to pay him, in addition to a fixed salary, a percentage of its net profits, where in computing the net profits it was necessary to make an allowance for depreciation of the plant, and the defendant in making such allowance had adopted the method commonly prevailing in its kind of business of deducting a percentage and thus deducted six per cent from the cost value of the plant, which a master found was a reasonable allowance for depreciation, it was *held,* that the burden was on the plaintiff to show that six was a wrong percentage to deduct, and that the finding of the master on this point, being warranted by the evidence, could not be pronounced erroneous.

In a suit in equity against a corporation manufacturing textile products to recover for services of the plaintiff as representative and selling agent of the defendant for which the defendant agreed to pay him in addition to a fixed salary for a year a percentage of its net profits during that year, the parties having agreed to consider the business for that year by itself, the defendant cannot be allowed to deduct losses from bad debts incurred from business done before the beginning of the plaintiff's contract, and the defendant, if necessary, must change its usual methods of bookkeeping, in order to ascertain the "net profits" accruing to the defendant's business during the period of the plaintiff's employment.

BILL IN EQUITY, filed in the Superior Court on December 21, 1912, against a corporation engaged in manufacturing textile products, alleging that on October 28, 1908, the plaintiff was employed as the representative and selling agent of the defendant under an agreement by which he was to receive $5,000 a year and eight per cent of the net profits; that the plaintiff rendered the required services and received such salary and $1,124.34 represented by the defendant to be eight per cent of the net profits until December 1, 1910, when a new contract was made under which the plaintiff was to receive $7,500 a year and five per cent of the net profits; that the plaintiff rendered the required services under such new contract and received the agreed salary and $39.11 represented by the defendant to be five per cent of the net profits for the year 1911; that the plaintiff terminated his employment in December, 1911; and that the net profits were greater than the amounts paid to the plaintiff by the defendant as such net profits; with a prayer for an accounting.

The case was referred to William R. Bigelow, Esquire, as master,

to hear the parties and report his findings to the court together with such facts and questions of law as either party might request. The findings of the master are described in the opinion.

The case was heard by *Wait,* J., upon the exceptions of both parties to the master's report.

The plaintiff's fifth exception was as follows: "For that the master has found that all the bad debts of the defendant which were charged off in October and November of 1911 might properly be charged off at that time against the plaintiff and should be deducted from the gross receipts for that year in arriving at the net profits upon which the plaintiff's commission was based."

The defendant's first objection to the master's report, on which the defendant's first exception was based, was as follows: "The defendant objects to the rulings of the master to the effect that in ascertaining the share of the net profits to which the plaintiff is entitled a proper charge for depreciation should not be considered. The defendant objects to this ruling upon the ground that it is erroneous as a matter of law, the proper method of arriving at net profits being a question of law, the master having found as a fact that if a charge for depreciation is to be taken into account the six per cent charge made by the defendant is a proper one."

The exceptions of both parties were overruled by *Wait,* J., and both the defendant and the plaintiff appealed from the interlocutory decree.

Later *Pierce,* J., made a final decree ordering that the defendant pay to the plaintiff the sum of $4,486.23 together with the costs of suit taxed in the sum of $42.19 and that execution issue therefor. Both parties appealed.

*James J. McCarthy,* (*R. M. Bowen* with him,) for the plaintiff.

*S. S. FitzGerald,* for the defendant.

RUGG, C. J. The chief question presented by this case is the meaning of the words "net profits" in a contract between the plaintiff and the defendant, whereby the former became a selling agent for the defendant, a textile manufacturer, at a stated annual salary and in addition a percentage on net profits. "Net profits" have a fairly well defined significance in law. Profits in a going business implies a comparison between two dates. In the contract between these parties those dates are the begin-

ning and the end of each of the two years as to which the plaintiff seeks to recover his percentage. As applied to these two periods, "net profits" mean a comparison between the assets of the defendant on these dates. Net profits will be represented by the difference between a sum made up at the end of the year of the receipts from the business, the amount due for goods sold, the value of all stock, materials, machinery, tools, real estate, and plant, on hand, and another sum made up of the value of all similar physical items at the beginning of the year, of all payments made and liabilities incurred for expenses, and of losses sustained by bad debts or otherwise. "In other words, they [net profits] would be what should remain as the clear gain of the venture, after deducting from the net value of all assets on hand the capital invested in the business and all outstanding liabilities." Sheldon, J., in *Thurston* v. *Hamblin,* 199 Mass. 151, 158.

In order to ascertain what the difference is between the assets on these two dates, a valuation of approximate correctness ought to be made as of the several material dates. Plainly, where a manufacturing property is involved, the buildings and machinery must be considered.

The controversy in the case at bar centres on the point whether a reasonable depreciation on the building and machinery and such like physical property owned and employed by the defendant in the production of its manufactured goods should be included among the elements making up the amount to be deducted from the receipts. It is clear that the value of buildings and machinery devoted to the manufacture of textile products cannot in the nature of things be the same after a year of use that it was at the beginning. There must have been deterioration. Machinery wears out. Buildings tend toward decay. Both may diminish in value by reason of advance in the state of the art of manufacturing, or by inventions of more effective devices. In order that any such concern may be maintained at uniform efficiency, there must be allowance for depreciation. It has been decided expressly that a reasonable deduction for depreciation should be made in determining net profits in a contract between a manufacturer and agents not unlike the one at bar in its legal aspects. *Stone* v. *Wright Wire Co.* 199 Mass. 306, 308. The same conclusion in principle was reached in *Knoxville* v. *Knoxville Water*

*Co.* 212 U. S. 1, 13, and *Conville* v. *Shook*, 144 N. Y. 686. See also in this connection the luminous discussion of "net profits" in the judgment of Fletcher Moulton, L. J., in *In re Spanish Prospecting Co. Ltd.* [1911] 1 Ch. 92, 98 to 101. The contention of the plaintiff, that under his contract there should be no deduction for depreciation before computing his percentage on net profits, cannot be supported.

The depreciation was not calculated by the defendant upon an actual appraisal of machines and buildings in detail, but by taking as a basis the book value of the plant of 1908 and adding to it the actual expenditures for new construction, and then deducting a percentage of six per cent upon that total. The book value perhaps naturally would be the cost value. In the absence of any evidence showing that the book value was not the true value, this method cannot be pronounced wrong as matter of law. It cannot be said that a computation of depreciation by a percentage upon cost is not reasonably accurate for the practical purposes of a going business, in the absence of definite evidence to the contrary.

The amounts actually expended for repairs and maintenance of the plant rightly were allowed as expenses in arriving at net profits. Buildings and machinery must be kept in usable condition in order that the business may go on. That is a quite different matter from depreciation, which is a deterioration arising from age and use and improvements due to better methods, more economical and efficient designs, inventions and general advance in the art, notwithstanding reasonable current repairs.

The master, having found that depreciation usually was reckoned in business like that of the defendant at some ratio of value to the plant, further found that the witness Fisher was qualified to express an opinion as to that ratio of depreciation. Fisher had been the assistant treasurer of the defendant for two and a half years. His experience had been mainly that of an accountant, and he had worked in the statistical department of an insurance company, in the banking business, and for four years he had had to do with the books of four large worsted mills and knew of their practice as to the charging off depreciation. He was familiar with the real estate and the plant of the defendant, with the prices of machinery and its renewals, and had made a study of depreciation.

This is a slender qualification for a witness. But he was subjected to a lengthy cross-examination as to his method and reasons for arriving at the ratio of depreciation, which exhibits some intelligence respecting the subject, and which well might have been augmented by his appearance on the witness stand. The determination of the competency of an expert witness is usually within the discretion of a trial magistrate. There was no exception to the finding of the master that depreciation commonly was ascertained by a percentage upon the value of the plant, and Fisher was doubtless an expert accountant in regard to this kind of business. With some hesitation we conclude that no reversible error was committed in receiving his testimony, which in substance was confined to the customary percentage of depreciation in this branch of manufacture.

The plaintiff has the burden of proof. He is attacking the correctness and accuracy of the method of reaching the proper item to be deducted from the income as depreciation which was adopted by the defendant. Some amount should be deducted on this account. The defendant adopted the method commonly prevailing of deducting a percentage. The question is whether six was a wrong percentage. Plainly, the finding of the master upon this point cannot be pronounced erroneous.

The master's finding upon depreciation is not quite clear. It is that "The item of $8,500 deducted for depreciation in 1909 was only an estimate." We interpret this to mean that upon the evidence the plaintiff showed to the satisfaction of the master that the depreciation charged by the defendant for that year was not a reasonably accurate estimate nor based upon a "ratio to the value of the plant." There is a finding, however, that the book value of the plant in 1908 was $127,975.31, and that the new constructions during that year amounted to $3,770.64, making a total of $131,745.95 as the value of the plant when the first contract of the plaintiff began. In view of the master's other finding, that a six per cent annual depreciation upon the plant was a reasonable deduction, he should have made such deduction, amounting to $7,904.76, and substituted it for $8,500 in the account. The master's further finding that the depreciation deduction made for 1911 was six per cent on the book value of the plant, shows that the defendant made no error in this respect for

the year 1911, in view of the other finding that this percentage was reasonable.

During the year 1911 the defendant charged off bad debts amounting to $8,335.75 on sales made before that year. The master finds that, so far as this is a matter of fact, these debts properly might have been charged off at that time and should be deducted from the gross receipts of that year in arriving at net profits. There was error in deducting these losses arising from business done before the beginning of the plaintiff's contract. The agreement was not that net profits should be ascertained and determined solely according to the defendant's usual methods of bookkeeping and habits of conducting business and without any change. Such a contract might have been made. But, instead of making such a contract, the parties agreed that the plaintiff should receive a per cent on the "net profits." These words mean in this connection that the parties have agreed to consider the business of that year by itself, separate and apart from the years which have gone before and are to follow. It is in this respect as if a new partner were admitted to a firm without agreement to assume debts and assets. A new set of books would need to be opened, recording only the transactions of the new year or period. The natural inference from the contract is that the plaintiff as selling agent would find his good judgment and skill in this department reflected in the profits, on which his percentage would be based; while the defendant would see the activity and efficiency of the plaintiff due to this incentive, resulting in increased sales. This may be inconvenient. It may necessitate keeping the books open to determine losses after the contract period has ended. But it is inevitable from the nature of such a contract. The net profits of a business for a specified time may be calculated in accordance with any reasonable method, until the rights of a third person intervene. Then they must be determined in a way to be just to him. In the absence of a definite stipulation to that effect, it would not be fair to one who has become interested in a business on the basis of profits for a fixed time, to share in losses incurred before that time. The expenses, the losses and the gains accruing to the defendant's business during the period of the plaintiff's employment, even though not realized until after its termination, must form the basis on which his percentage must

be computed. Sufficient facts do not appear in the master's report to enable us to determine this with certainty.

Seemingly there must be a further hearing or agreement by the parties to settle this branch of the case. The plaintiff's fifth exception, relating to this point, must be sustained and all his other exceptions overruled. The defendant's first exception to the master's ruling, in substance that no deduction for depreciation of machinery and plant should be made in ascertaining the net profits, must be sustained and its other exception, being waived, is overruled. The interlocutory decree is modified by sustaining these exceptions. The final decree must be reversed.

*So ordered.*