L. SHERMAN ADAMS *vs.* EASTERN MASSACHUSETTS STREET RAILWAY COMPANY & others.

Suffolk. March 18, 1926. — October 1, 1926.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Eastern Massachusetts Street Railway*, Trustees, Dividends.

A decision by the trustees of the Eastern Massachusetts Street Railway Company appointed under Spec. St. 1918, c. 188, § 2, on the question, whether dividends should be paid on common and on adjustment shares, will not be set aside in a suit in equity under § 22 of the statute if they acted honestly and in good faith and their determination was not contrary to law.

The provisions of § 4 and of § 14 of Spec. St. 1918, c. 188, are to be read together, and the trustees of the Eastern Massachusetts Street Railway Company, appointed under § 2 of that statute, could not be required to pay dividends on the common and on the adjustment shares of stock from a balance which remained after merely keeping the street

railway in the condition in which it was when they took office, if from that balance other disbursements are necessary to restore the street railway to a safe and proper condition; it was part of their duty to apply the earnings of the street railway to the placing of its roadbed and appliances in safe condition.

The expenses necessarily incurred by the trustees for a restoration of the property of the Eastern Massachusetts Street Railway Company to a proper condition so that it could be operated with safety were operating expenses and were not betterments to be charged to the capital account.

An honest exercise of discretion by the trustees of the Eastern Massachusetts Street Railway Company, appointed under Spec. St. 1918, c. 188, § 2, in preventing an overcapitalization is not in violation of law and will not be revised in a suit under § 22 of the statute.

Where, upon findings by a master in a suit under Spec. St. 1918, c. 188, § 22, against the trustees of the Eastern Massachusetts Street Railway Company, appointed under § 2 of that statute, it appears that certain reserves set aside by the trustees from earnings for Federal and municipal taxes were unreasonable and, upon findings by the master, it appeared to this court that an amount carried by the trustees as a reserve for tax liabilities was excessive, but that the trustees acted in good faith, it was *held*, that the judgment of the trustees in determining not to distribute any of such sum as dividends upon the common and the adjustment shares at the time when the suit was brought was not contrary to law and should not be set aside.

In the suit above described, the master found that certain expenditures made by the trustees for the building of a shop to take the place of another shop which they had abandoned and for the construction of an extension to a public park, which expenditures had been charged by the trustees to operating expenses, should be treated as permanent additions to capital; that certain reserves set up by the trustees for contingent liabilities and fire insurance were excessive; and that in fact there was a surplus of net earnings by the corporation which was available for dividends. Upon reservation of the suit for determination by this court, it was *held*, that, it appearing that the trustees were men of integrity and business experience, that, in large measure, they had left the active management to their chairmen, that the chairmen had been men of experience who had endeavored to manage the company for "its best good as they saw it" and that the trustees had acted in good faith, the determination by the trustees not to pay dividends could not be said to be contrary to law and should not be set aside.

In the suit above described, it also was *held*, that the decision by the trustees in taking into account, on the question of dividends, obsolete and abandoned property, and in deciding that expenditures necessary to keep the capital intact were operating expenses to be paid before dividends were declared, could not be said to be unreasonable or in violation of law.

BILL IN EQUITY under Spec. St. 1918, c. 188, § 22, filed in the Supreme Judicial Court for the county of Suffolk on July 30, 1923, and a supplemental bill filed by leave of court

on July 9, 1924, praying the court "in the exercise of its general jurisdiction as well as its jurisdiction to review the rulings and orders of the trustees, to decree: (1) that dividends are a part of the cost of service, to be treated as such, and that it is the duty of the trustees to annually apply the earnings of the company to the payment of cost of service, including annual dividends, and in accordance with § 6 of the statute to capitalize in the form of common stock amounts deducted from the earnings of the company otherwise applicable to dividends and applied to the payment of instalments of serial bonds or other evidences of indebtedness, and distribute the same to the stockholders as dividends to the extent that they are deprived of dividends in cash by such deductions; (2) that the trustees have no right to divert from the payment of dividends for the" year 1922 and "year 1923 earnings or surplus in order to provide for the future payment of bonds representing capital investments maturing in future years, and be enjoined from so doing; (3) that charges to operating expense for depreciation of road and equipment and property abandoned, representing on the books of the company a decrease for the amounts thereof in the valuation of the road and equipment with a corresponding decrease of book earnings and surplus, are unlawfully made if in fact when made the value of the road and equipment and property abandoned greatly exceeded its real value at any prior date by reason of additions, improvements and rehabilitations to or of the same which had been made prior to the date of such charges; and that the trustees be enjoined from continuing to make such charges against the earnings of the road and from withholding the application of earnings to the payment of dividends; (4) that the trustees pay or cause to be paid to the plaintiff and other shareholders said dividends which have accrued and remain unpaid on the adjustment and common shares."

The suit was referred to a master. His report was filed on January 29, 1926. Besides the facts stated in the opinion, the master made the following findings.

On the subject of dividends paid in stock, referred to in the plaintiffs' exceptions to the report and in the opinion, he found as follows:

"On January 3, 1922, the company deducted from its earnings the sum of $400,000, applicable to the payment of dividends, and with it paid and retired $400,000 of serial bonds. On January 4, 1922, by authority of § 6 of the act, the directors voted to capitalize this payment of $400,000 in the form of common stock. Stock to that amount was issued and distributed at par *pro rata* amongst the holders of sinking fund and first preferred shares, and profit and loss was reduced by the same amount. The plaintiff's contention is that under the act such issue of shares is authorized only for the payment of dividends, which payment of dividends should be capitalized and shown on the books on the asset side of the balance sheet by an item of $400,000 stated to be an adjustment of capitalization in common stock to an amount equal to that diverted from earnings for payment of bonds issued and used for the purpose of dividend payments. He claims that this transaction should not have diminished the profit and loss account, but that undivided profits should have remained as they stood before. I do not take this view however.

"When the $400,000 of bonds were paid both cash and liabilities were decreased by that amount, leaving surplus unaffected. When the $400,000 of common stock was issued and put into the treasury the liability account and asset account were both correspondingly increased, and surplus was still unaffected. When this stock was distributed amongst the shareholders treasury stock as an asset account was decreased by the amount so paid while capital stock as a liability remained undiminished. But when this stock was distributed amongst the shareholders they received it as dividends in lieu of cash representing earnings shown in the profit and loss account. That account therefore was properly diminished by this sum. The final result of the transaction was that the new stock took the place of the bonds in the capital structure, the stockholders having received the stock in place of cash. The profit and loss account would have been diminished by $400,000 had the stockholders received the cash as dividends, the bonds remaining outstanding. The profit and loss account must likewise be diminished by

the par value of the new stock which took the place of cash used to retire bonds. The effect was the same as if the amount had been paid as dividends directly from surplus.

"A similar charge to profit and loss of $208,482.72 represents a further sum paid for the retirement of bonds, capitalized in common stock, and distributed to shareholders. In this instance however instead of issuing shares to the above amount, the company used and distributed common shares of that par value which had been held in the treasury. The market value of the company's common shares in 1922 varied from $10 a share in January to $22 a share in December."

On the subject of reserves for taxes, referred to in the opinion and in the defendant's second exception to the report, the master found: "Included in the item of tax liability in the company's reports to the department is the sum of $16,476.60, — municipal excise taxes carried forward from 1919. These taxes were never assessed, except that a tax bill for $845 was sent to the company by the town of Hull in 1919. There is no likelihood that any part of this amount of $16,-476.60 will ever have to be paid. In the same item is included the amount of $37,340.40 carried as Federal income tax for 1919. No income was reported by the company for that year and no tax was assessed, but the trustees have continued to carry this sum as a tax reserve giving as their reason therefor that the government has not yet examined the company's books with reference to its tax returns for 1919. Taking the facts stated in the company's sworn tax return to be correct, there is no reasonable ground to anticipate that the company will ever be called upon to pay this sum. These two amounts, therefore, which as late as December 31, 1924, were still carried as liabilities, should be added to the surplus."

The master's findings on the items as to the Campello shop and the Victory Park extension, charged to operating expenses by the trustees and referred to in the opinion and in the defendant's second exception, were as follows:

"As to the Campello shop item of $24,754.93, the reason given by the trustees for not taking the betterment allowed was that the rebuilding of the Campello shop was contempo-

raneous with the abandonment of certain other shops which were not charged off when abandoned, and the total shop facilities in use after the changes were less than before. The item $21,686.52 (Victory Park extension), represented the cost of constructing an extension line to a city park in Lawrence, the full amount of which cost was allowed as a betterment by the department. Before this line was built city officials had stated that if the company did not extend its tracks the city would permit public automobile service to the park. To prevent such service, the defendants claim, and to keep and increase the good will of the residents of the city, the company built the extension, with an understanding between it and a voluntary committee of citizens that the cost of the extension should be charged month by month to operating expenses of the Lawrence division.

"Other additions and improvements of similar character were made which resulted in an increase of assets . . . .

"I find that the above sums, amounting in all to $76,241.72 represent additions to assets and are properly chargeable to capital and not operating expenses, and therefore should be added to surplus."

The master's findings as to the Glidden deposit, which is the subject of the defendants' fifth exception and is referred to in the opinion, were as follows:

"As a part of the adjustment between the Company and the reorganization managers, the latter were obliged to turn over to the company cash and securities totalling in value $604,996.44, taking the securities, which included only bonds and stock of the company, at their par value. The company agreed to indemnify the reorganization managers from certain charges, expenses and liabilities, if any, incurred by them, and as a reserve from which to meet this obligation, set up a credit account on their books called the 'Glidden deposit' of the aforesaid amount, in which the cash and securities were carried among the assets of the company. Before the end of 1922, expenses to the amount of $61,907.27 were paid pursuant to the indemnity agreement, reducing the amount of the credit balance at the end of the year to $543,-089.17. The company has since reduced this credit balance

by further similar payments and allowances totalling $205,845.12. There are further obligations to be met which will probably not exceed the sum of $40,300. This leaves a net amount of $296,944.05 to the credit of the Glidden account which will probably not have to be used and which should, therefore, be treated as a part of the company's surplus.

"On December 31, 1922, among the liabilities against which the Glidden deposit stood as security were possible claims against the receiver of the Bay State Street Railway Company arising out of the destruction of property resulting from the collapse of a molasses tank owned by the United States Industrial Alcohol Company, for which suits for damages had been brought by the receiver against the latter company. These suits were still pending when hearings before me were begun, but have since been terminated, and sums have been received which are sufficient to cover any liability of the receiver on the freight claims. Although I cannot say that on December 31, 1922, the possible liability of the receiver was so remote as to make a reserve against it unwarrantable, yet by reason of the fact that no such claims now exist, I have not included them in liabilities covered by the Glidden deposit."

Material findings by the master on the subject of reserves for insurance, referred to in the opinion and in the defendant's exception, were as follows:

"By reason of inconsiderable losses and because of fire preventive measures and devices adopted by the company, it was enabled to insure its property again at greatly reduced premiums, covering its rolling stock and buildings in active use but not covering buildings the use of which had been abandoned. The cost of the insurance is borne by operating expenses. In 1922 the insurance carried did not protect against losses of less than $20,000 from any one fire. For that year therefore I think a reserve of $20,000 would have been adequate, and that the amount of the reserve should be reduced from $194,554.18, as it was carried, to $20,000, leaving a difference of $174,554.18, which should not appear in the balance sheet of that year as a liability. After 1922

the insurance carried was not limited to losses exceeding $20,000 and after that date a reserve of $10,000 would seem to be adequate to protect the unused buildings which were not insured. For those years therefore the liability side of the balance sheet should be reduced by $190,000 which is the difference between $200,000, the amount of reserve carried, and $10,000, the amount of a reasonable reserve."

The plaintiff filed objections to the master's report, which, under Equity Rule 26 (1926), became exceptions to the report when it was filed. Such objections were as follows:

"1. Because the master does not anywhere in said report say that his view . . . that the profit and loss account should be diminished by the par value of $400,000 common stock distributed as dividends, was a ruling of law, and that the contention of the plaintiff [on that subject, stated in the report] . . . was also made as a question of law.

"2. Because the master has not . . . included in the surplus of the company said amount of $400,000 which had been charged to surplus account, as found by the master.

"3. Because the master does not anywhere in said report say that his view . . . that the profit and loss account should be diminished by the par value of $208,482.72 common stock distributed as dividends, was a ruling of law, and that the contention of the plaintiff [on that subject, stated in the report] . . . was also made as a question of law.

"4. Because the master has not . . . included in the surplus of the company said amount of $208,482.72 which had been charged to surplus account, as found by the master."

The defendants likewise filed objections which were as follows:

"1. Because the master makes the following finding: 'If the balance between assets and liabilities is to be considered as having been fixed by the statute, thereafter to remain as it stood at the time of incorporation, the question would seem to be simply whether or not the revenue of the road has been sufficient to cover the cost of operation, maintain the property in the same condition as it then was, and yield the return upon invested capital specified in the act. . . . If this view prevails, then I find that dividends have

been earned. Revenue has been sufficient to cover the full cost of service as defined in the act, including dividends at the rates specified on all classes of shares, leaving actual values not less than they were on June 1, 1919. More particularly stated, the operation of the road has yielded enough income to meet proper maintenance and all other operating expenses, pay taxes, rentals, interest on all obligations, dividends on the preferred stock and six per cent on the common stock, make adequate allowances for depreciation, obsolescence of property, rehabilitation, and losses in respect to property sold, destroyed and abandoned, and defray all other charges which properly may be made against income or surplus.'

"2. Because the master finds that two sums amounting to $16,476.60 and $37,340.40, included in the reserve for taxes, should be added to the surplus.

"3. Because the master finds that certain items amounting to $76,241.72 covering the cost of certain work, equipment and alterations, are properly chargeable to capital and therefore should be added to surplus.

"4. Because the master finds that the reserve representing the liability to the United States government on account of the construction of tracks to the Fore River works should be reduced by the sum of $123,131.

"5. Because the master finds that the sum of $296,944.05 to the credit of the Glidden deposit should be treated as a part of the company's surplus.

"6. Because the master finds that the amount of the insurance reserve in 1922 should be reduced by $174,554.18 and in subsequent years by $190,000.

"7. Because the master finds that no further charge to operating expenses need be made on account of abandoned property beyond the monthly amortization allowance.

"8. Because the master makes the following finding: 'From June 1, 1919, to December 31, 1922, the increase of asset value of the property rehabilitated resulting from turning earnings back into property, and charging expenditures for rehabilitation to operating expense, in addition to all increases of assets shown on the books, was at least $1,920,835.03.'

"9. Because the master finds that rehabilitation work which exceeds in amount the fair rate of depreciation upon the valuation with respect to which the company was capitalized is in the nature of a betterment and is an increase in capital value to that extent and that therefore the sum of $1,920,835.03 should be added to the earnings for the years 1919 to 1922 inclusive.

" 10. Because the master finds that the surplus at the close of 1924 should be increased by $1,000,000 on account of rehabilitation work in 1923 and 1924 which should have been treated as betterments.

"11. Because the master finds, by way of recapitulation, that seven sums aggregating $2,645,654.98 should be added to the book surplus of December 31, 1922, and that the true surplus as of that date was $3,632,450.26 and that the surplus at the end of 1923 amounted to $3,722,233.29 and at the end of 1924 to $4,343,141.83.

"12. Because the master finds or rules that the reserve fund of $500,000 is 'available for dividends.'

"13. Because the master makes the following finding: 'Charges were made to operating expenses for betterments and additions, which are dealt with specifically above and are summarized under the heading "Recapitulation."'

"14. Because the master excluded the evidence offered by the defendants of certain comparative statistics of the eight other largest street railway companies in Massachusetts, as appears from the offer of proof stated by the master."

The evidence offered by the plaintiff and referred to in the next to the last paragraph of the opinion was described by the master as follows:

"The plaintiff offered testimony, which I excluded, to the effect that when he read the vote on the common share certificate he did not understand that it meant or was intended to mean that the trustees had the right in the exercise of their discretion to withhold earnings of the company or the surplus of the company from the payment of the cost of services including six per cent dividends on the common stock when those earnings and that surplus were in amount equal

to the amount required to pay the cost of service including such dividends, and to my exclusion of this testimony the plaintiff excepted.

"There was no evidence in the case, other than the vote and its recital on the back of the certificate which the plaintiff read, of any notice to or knowledge of the plaintiff of any claim on the part of any one of a right in the trustees in the exercise of their discretion to withhold earnings of the company or its surplus from the payment of the cost of service, including dividends."

The record discloses no objection to this ruling of the master filed in accordance with Equity Rule 26 (1926).

The suit was reserved by *Crosby*, J., upon the pleadings, the master's report, and the exceptions of the parties, for determination by the full court.

Material sections of Spec. St. 1918, c. 188, are as follows:

"Section 4. The new company, for the purpose of paying for the railways, property and franchises of the company, may issue stock, bonds and other evidences of indebtedness in such amounts and proportions, with such par values and preferences, as may be approved by the directors and by the trustees. The entire capitalization of the new company, including stock, bonds and other evidences of indebtedness which may be issued to pay for, or which shall remain outstanding in respect of, the railways and property owned, leased or operated by the company which were included in the computation of investment value contained in the decision of the public service commission, dated the thirty-first day of August, nineteen hundred and sixteen, shall not represent a capital bearing an annual interest and dividend charge (common dividends being computed at the rate of six per cent per annum) which will exceed six per cent upon the sum of forty million two hundred eighty-two thousand three hundred and forty dollars, plus such amounts as may be determined by the public service commission to have been additions to or improvements of the property of the company since the date as of which such computation was made: provided, that no such additions or improvements shall be included which were made with the proceeds of receiver's

certificates or receiver's notes retired as provided in section eight hereof. The public service commission shall make such further adjustments of said sum as will represent present values on a six per cent basis of rentals payable on account of property of street railways leased by the company within the Commonwealth and included in said computation. The public service commission shall also deduct from the said sum the value of any property sold or otherwise disposed of by the receiver before the organization of the new company at the value, if any, at which the same was included by the public service commission in said computation."

"Section 8. The new company shall not acquire the property of the company until the trustees are satisfied that provision has been made for the paying in of one million dollars in cash by the holders of shares or securities of the company for shares, bonds or other evidences of indebtedness of the new company to be used in rehabilitation of its lines or for other corporate purposes and also that provision has been made for the immediate sale of serial bonds issued under the provisions of section five and subject to the agreements provided in section nine to the amount of two million five hundred thousand dollars. From the proceeds of such sale five hundred thousand dollars shall be set aside as a reserve fund to be used as hereinafter provided, and two million dollars shall be set aside to be expended by the trustees in additions or improvements upon the property or in the payment of receiver's certificates or receiver's notes issued for the said purposes. One million five hundred thousand dollars additional of serial bonds authorized under the provisions of section five and subject to the agreements provided in section nine shall be issued and sold on or after one year from the date of the organization of the new company whenever the trustees consider that funds are needed for the purposes enumerated and may be raised to advantage by the methods provided in said sections."

"Section 16. The reserve fund shall be used only for the purpose of making good any temporary deficiency in income pending an increase of fares, and until such use, may be invested in income producing securities in the discretion of

the trustees, and all income or interest received thereon shall be treated as part of the general income of the new company.

"Whenever the income of the new company from operation is more than sufficient to meet the cost of the service, the excess shall be added to the reserve fund."

*B. B. Jones*, (*P. N. Jones* with him,) for the plaintiff.

*R. G. Dodge*, (*J. W. Sullivan & P. G. Carleton* with him,) for the defendants.

CARROLL, J.   This is a suit in equity to compel the trustees of the Eastern Massachusetts Street Railway Company (hereinafter called the Company), to declare and pay dividends on the common and adjustment shares.

The Company was organized under Spec. St. 1918, c. 188. This statute authorized the Company's acquisition of the property of the Bay State Street Railway Company.   Under § 2 of the statute the Governor was directed, with the advice of the Council, to appoint five trustees, who took over the property June 1, 1919, and since then have been in control; § 4 authorized the Company to issue stock, bonds and other evidence of indebtedness; § 8 provided for the payment of $1,000,000 to be used for the rehabilitation of the property and other corporate purposes, and by this section provision was also made for the sale of bonds, directing the purpose to which the proceeds were to be applied; § 11 gave authority to the trustees to manage and operate the Company and "exercise all the rights and powers of the new company and its directors," "except as . . . otherwise provided herein." By this section the trustees were given the right to fix fares, to determine the character and extent of the service and the facilities to be furnished, "and in these respects their authority shall be exclusive"; § 14 provided that the trustees were to fix such rates and fares as would meet the cost of service, which cost of service was to include, in addition to proper maintenance, operating expenses, taxes, rentals and interest on bonds, "stated dividends on the preferred stock and six per cent on the common capital stock," as well as "such allowances for depreciation of property and for obsolescence and rehabilitation" and for such losses in respect to property sold, abandoned or destroyed as the trustees might deem adequate.

Certain dividends have been paid on the adjustment shares but no dividends have been paid on the common shares. On the back of all certificates is printed a vote of the directors, passed May 29, 1919, in part as follows: "Whenever all prior dividends accrued on the First preferred stock, the Sinking Fund stock, the Preferred B stock, and the Adjustment stock have been paid or set apart, and all prior payments to the Sinking Fund for the redemption of the Sinking Fund stock have been made, the Public Trustees at any time during the period of public control, or the Board of Directors at any other time, may, in their discretion, declare and pay dividends on the common stock." Each stock certificate on its face purports to give the holder the "rights . . . fixed and determined by the vote of the Board of Directors of the said company passed on May 29, 1919, a copy of which vote is printed on the back of this certificate and by reference incorporated herein."

On May 31, 1919, the stockholders of the Company voted as follows: "That the president or any vice-president and the treasurer or any assistant treasurer be and they hereby are authorized and directed to execute and issue . . . pending the preparation of permanent stock certificates, temporary stock certificates in substantially the same form authorized at the special meeting of the board of directors held Thursday, May 29, 1919." As bearing on the effect of this action, see *Boston & Albany Railroad* v. *New York Central Railroad,* 256 Mass. 600, 609, 610, 614.

The case was referred to a master to hear the parties and their evidence and find the facts. He found that the property was in poor condition when the new company came into possession of it in 1919; that some equipment was then obsolete, and from time to time the trustees abandoned a part of the property; that under § 15 of the statute the trustees divided the lines into fare districts; that new rolling stock had been purchased, rails renewed and cars repaired; that they had erected buildings and adopted many new and economical types of equipment; that including the year 1922 they had applied for the work of rehabilitation the sum of $539,044.41 of the fund provided for in § 8 of the statute, and

during this time there had been charged to operating expenses the sum of $1,920,835.03, which sum was expended for rehabilitation of the road; that under the former management the property was allowed to deteriorate and no reserve was accumulated for depreciation, and a larger part of the expense for rehabilitation was incurred because of this; that the fair investment value of the property on June 1, 1919, was the sum in respect to which it was capitalized, namely, $41,401,825.72; that the rehabilitation work which exceeds in amount the fair rate of depreciation upon that valuation is in the nature of a betterment and an increase in capital value to that extent; that the trustees did not consider that the amount fixed by the act was controlling, and that they decided that dividends could not be paid until the depreciation charges, for which no provision was made by the Bay State company, had been taken care of.

The master also found, "Since the Public Trustees took control they have expended large sums for the rehabilitation of the road and equipment. Much of this work was done to restore the impaired condition in which they found the system. Under former management the old company had permitted its property to deteriorate and had accumulated no reserve for depreciation. By what they have done in this respect the Trustees have raised the road to a proper standard of efficiency. In consequence the value of the property as a whole for operating purposes is greater today than it was in 1919."

"If the balance between assets and liabilities is to be considered as having been fixed by the statute, thereafter to remain as it stood at the time of incorporation, the question would seem to be simply whether or not the revenue of the road has been sufficient to cover the cost of operation, maintain the property in the same condition as it then was, and yield the return upon invested capital specified in the Act. If the statute is so construed, it means that the trustees are to operate the property, maintain it at the condition it was in when received, and are not to improve or increase its capital value out of income until they have paid all the cost

of service, including dividends. If this view prevails, then I find that dividends have been earned."

"It is true that the road was in poor condition when the new company took it over in 1919. Since then the trustees have improved the property in every operating respect and have brought the part of it which is now in use to a high state of repair and efficiency. From June 1, 1919, to December 31, 1922, the increase of asset value of the property rehabilitated resulting from turning earnings back into property, and charging expenditures for rehabilitation to operating expense, in addition to all increases of assets shown on the books, was at least $1,920,835.03.

"If the question of investment value is open after the Legislature has fixed the amount at which the property might be capitalized, I find as a fact that the fair investment value of the property on June 1, 1919, was the sum with respect to which it was capitalized, namely, $41,401,825.72, and that rehabilitation work which exceeds in amount the fair rate of depreciation upon that valuation, is in the nature of a betterment and is an increase in capital value to that extent."

The statute did not provide that dividends were to be paid on the value of the property as fixed by the commission. The cost of service included such allowances for depreciation and rehabilitation as the trustees deemed adequate, and in this respect their judgment was not limited.

The trustees admit that dividends are included in the cost of service, but contend they have been unable to obtain sufficient revenue from fares to pay dividends on the common stock; that rates are sufficiently high; that passengers in one district would object to an attempt to make them pay a part of the cost of service in another district; that such a course might bring about increased automobile competition, or a demand for reduction in fares, or both; that they can introduce no further economies of operation; that the rates are as high as the public will pay; that it is impossible to increase revenue by increasing fares, and also, that it is necessary to be ready at all times to meet wage increase; that they are right in applying the income to the rehabilitation of the road, including therein the depreciation which occurred

during the operation of the Bay State Street Railway Company and the receiver.

The master further found that the trustees were men of integrity and business experience who have in large measure left the active management to their chairmen, that the chairmen have been men of experience who have endeavored to manage the Company "for its best good as they saw it."

The plaintiff contends that the trustees are required under the statute to use the earnings of the Company for the payment of dividends as a part of the cost of service, and not to subordinate the payment of dividends "to the creation of an accrued depreciation reserve." The defendants contend that they have the right to withhold dividends on the ground that the investment value adopted as a basis of capitalization under § 4 was excessive because worthless and depreciated property was therein included at high valuations; that the statute was not intended to deprive them of the necessity of considering the financial condition of the road in all its aspects before deciding that dividends had been earned.

The Legislature in providing for the reorganization of the road and creating a new company gave the trustees authority to use their sound discretion and judgment. Their decision on the question of dividends is not to be set aside and the judgment of another tribunal substituted in applying funds to the restoration of the property, if they acted honestly and in good faith, unless their determination was contrary to law. As was said in *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, at pages 417, 418, "Every rational presumption must be made in favor of the decision of men thus appointed. Their conclusion would not be set aside unless unsupported in law." *Mayor & Aldermen of Springfield, petitioners*, 234 Mass. 578, 584.

As we construe the master's finding, the trustees acted in good faith. They were required to determine, in the first instance, what property should be abandoned and the extent of rehabilitation necessary. If their decision was in good faith, and was not unreasonable or unsupported by law, it must stand. It was a part of their duty to apply the earnings to the placing of the roadbed and appliances in a safe

condition.  See *Thomas* v. *New York & Greenwood Lake Railway,* 139 N. Y. 163.

It is not contended by the defendants that the trustees could act as directors in an ordinary corporation and improve the capital value of the Company's assets before dividends could be said to have been earned.  The statute, however, was not intended to deprive the trustees of all discretion in respect to dividends.  It was intended that they should act with proper consideration for the interests of the corporation and its creditors as well as for the rights of stockholders, and the Legislature contemplated that the road should continue to be operated as a going concern.  See *Barnard* v. *Vermont & Massachusetts Railroad,* 7 Allen, 512; *Field* v. *Lamson & Goodnow Manuf. Co.* 162 Mass. 388; *Fernald* v. *Frank Ridlon Co.* 246 Mass. 64; *New York, Lake Erie & Western Railroad* v. *Nickals,* 119 U. S. 296.

In the cost of service under § 14, there were included such allowances for depreciation and rehabilitation as the trustees deemed adequate as well as losses from property sold, abandoned or destroyed.  And these allowances were not confined to depreciation and losses occurring after June 1, 1919; they included the cost of replacement arising from the run-down condition of the road when they came into possession. The balance between assets and liabilities is not to remain as it stood at the time of incorporation; the statute makes no such declaration, and it is not to be construed that the trustees from the time they took possession are merely to maintain the road in the condition in which it was when they received it, and to pay dividends before the road was restored to a safe and proper condition.

These expenses for depreciation were not betterments to be charged to the capital account.  They could not properly be capitalized and they were a charge upon the earnings and should be paid for from the earnings.  The corporation was not a private concern; it was a public service corporation. The expenditures necessary for the restoration of its property to a proper condition so that it could be operated in safety were in fact operating expenses.  *Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, 14.  *Regan* v. *Farmers' Loan & Trust*

*Co.* 154 U. S. 362, 407. *Southern Railway* v. *Carnegie Steel Co.* 176 U. S. 257, 288, 289.

Although the public service commission under § 4 fixed the investment value of the property for which the Company was to be capitalized, this meant no more than the original cost of the property without deduction for depreciation. The Legislature intended that the property should be operated as a street railway company and it was necessary, if it were to continue so to operate, that its roadbed and appliances should be restored to a proper condition. The Legislature did not contemplate that dividends were to be paid from capital. Section 4 is to be read in connection with § 14, which gives authority to the trustees to make such allowances for depreciation as they deem adequate, as a part of the cost of service.

We find nothing in the report upon which to base a finding for the years 1923 and 1924. There is no fact found to show what amount was charged to operating expenses for these years. It could not be established by "the average of the years 1919 to 1922 inclusive."

Notwithstanding § 8 of the statute, there was no error in the method adopted by the trustees with reference to the reserve fund; § 16 deals with this reserve fund and the trustees had a discretion which was not abused in dealing with it as they did. In the method of accounting followed by the trustees they were dealing with a street railway corporation. They owed a duty to the public as well as to the stockholders, and if in preventing an overcapitalization they acted honestly their conclusion was not in violation of law, and it must stand.

The master found that certain reserves for Federal and municipal taxes were unreasonable. In our opinion it was not unreasonable or contrary to law for the trustees to act as they did. These taxes the Company may not be called upon to pay, but there is however no certainty about it. The trustees in the exercise of a wise discretion might properly act as they did. The amount of $16,476.60, carried as a tax liability from 1919, would appear to be excessive, but we do not think that the judgment of the trustees in this

respect should be set aside.   Taking into account the capital invested, the trustees were not required at this time to pay in dividends the amount involved in this item.

We find no error in the action of the trustees in reference to the Campello shop item and the Victory Park Extension. The building of the Campello shop was cotemporaneous with the abandonment of another shop.   The Victory Park Extension may not add to the value of the property and may not become a betterment.   They were not obliged to capitalize these items and might in the exercise of a sound discretion act as they did.   The same is true of the Glidden deposit, so called.   The settlement of certain demands, we understand, was made after the filing of the supplemental bill, and the trustees may never be called upon to account for all the sums held as a reserve in excess of the amount paid. See *Bauer* v. *International Waste Co.* 201 Mass. 197, 203. But in view of the provision of the statute and the discretion given the trustees we do not think that their decision should be reversed.   It may probably be that there will be no further obligations in this respect, but this is not certain.

With reference to the fire insurance reserve, the judgment of the trustees should prevail, as it does not appear that they acted capriciously or in bad faith.   The same can be said of the liability to the United States government for tracks constructed at Fore River.   The finding of the master on this item was based on the fact that the Company was to pay the government $317,000 at the rate of one cent for each passenger carried to and from the Fore River works. The trustees have in effect reduced this liability by more than half by setting up an item of $168,869 on the asset side of their balance sheet.   The master found that the sum of $25,000 is sufficient to represent the present worth of this liability.   Since the World War, the amount of travel to and from the Fore River works has greatly diminished, and "it probably never again will reach the volume developed under war conditions," nor can we foresee what may happen to the Fore River works.   The trustees may be called upon to pay a much larger sum than $25,000, and we can see no reason why their discretion should be disturbed.

The master was right in finding as he did that the amount of $608,482.72, representing dividends paid in stock, should be charged to the profit and loss account.

The trustees also have properly taken into account the obsolete and abandoned property in dealing with the question of dividends; expenditures necessary to keep the capital intact are operating expenses and are to be paid before dividends are paid. See *Kansas City Southern Railway* v. *United States*, 231 U. S. 423, 444, 445. The discretion of the trustees in this matter cannot be said to be unreasonable or in violation of law.

There was no error in excluding the testimony offered by the plaintiff bearing on his understanding of the meaning of the vote of the directors. Moreover, the exception which the plaintiff saved before the master was not before this court upon the record. *Goodwin* v. *Cosmopolitan Trust Co.* 248 Mass. 146.

The defendant's fourteenth exception is overruled, though the other exceptions of the defendants are sustained. An interlocutory decree is to be entered overruling the plaintiff's exceptions and the defendants' fourteenth exception, and sustaining the defendants' remaining exceptions. A final decree is to be entered dismissing the bill with costs.

*Ordered accordingly.*