ATTORNEY GENERAL *vs.* TRUSTEES OF BOSTON ELEVATED
RAILWAY COMPANY & another.

Suffolk.   December 5, 1944. — June 3, 1946.

Present: FIELD, C.J., QUA, DOLAN, RONAN, & WILKINS, JJ.

*Boston Elevated Railway Company. Attorney General. Equity Juris-
diction,* Information, Public control act, Declaratory judgment.
*Equity Pleading and Practice,* Parties, Bill, Demurrer. *Public Utilities.
Limitations, Statute of. Words,* "Depreciation," "Obsolescence."

Resolve 1941, c. 89, did not authorize the Attorney General to bring in
his own name an information in equity to obtain a declaratory decree
and injunctive relief with reference to certain items alleged to have
been wrongfully and illegally charged by the trustees of the Boston
Elevated Railway Company to the cost of service, thereby lessening
the amounts payable by the Commonwealth under the contractual
arrangement with the company established by the public control act,
Spec. St. 1918, c. 159, as amended; proceedings under the resolve
should have been a suit in equity brought by the members of the de-
partment of public utilities.
Interpretation of the contractual arrangement, established by the public
control act, Spec. St. 1918, c. 159, as amended, between the Common-
wealth and the Boston Elevated Railway Company, as to the authority
of the trustees thereunder as agents of the company to make certain
charges to the cost of service, was a proper subject for a suit in equity
brought under Res. 1941, c. 89, by the members of the department of
public utilities for a declaratory decree.
The mere inclusion of a prayer for an injunction in a bill in equity for
a declaratory decree did not require reversal of an interlocutory decree
overruling a demurrer to the bill where it appeared that the averments
of the bill were sufficient to present a case for a declaratory decree
and the question, whether an injunction should issue, could not be
determined until after a hearing of the suit on the merits.
The provision of § 6 of the public control act, Spec. St. 1918, c. 159,
enumerating, among items which the trustees of the Boston Elevated
Railway Company might charge to cost of service in their accountings
with the Commonwealth, "such allowance as they may deem necessary
or advisable, for depreciation of property and for obsolescence and
losses in respect to property sold, destroyed, or abandoned, [and] all
other expenditures and charges which under the laws of the Common-
wealth now or hereafter in effect may be properly chargeable against
income or surplus," and the provision of § 13 that they were to "main-
tain the property of the company in good operating condition and to
make such provision for depreciation, obsolescence and rehabilitation,

that, upon the expiration of the period of public management and operation, the property shall be in good operating condition," did not authorize the trustees to charge to cost of service in their accountings with the Commonwealth amounts which represented losses the company had sustained with reference to capital assets retired before the trustees took over possession and management, or depreciation or obsolescence which had accrued on the property prior to that time.

The determination of what sums should be expended by the trustees of the Boston Elevated Railway Company under § 13 of the public control act, Spec. St. 1918, c. 159, for "rehabilitation," if the $2,000,000 furnished by the company for additions and improvements proved insufficient for that purpose, was left in the first instance to the trustees, whose judgment could not be set aside in a suit in equity under Res. 1941, c. 89, unless it was shown, upon proof of averments of fact in the bill, that they could not have reasonably arrived at conclusions which they reached.

The reimbursement of the Commonwealth by the Boston Elevated Railway Company pursuant to St. 1931, c. 333, did not constitute such a final settlement of all financial matters then pending between them as to preclude the Commonwealth's thereafter questioning the validity of items previously included by the trustees in cost of service in their operation of the railway under the public control act.

A suit in equity in behalf of the Commonwealth to require the trustees of the Boston Elevated Railway Company to account for sums improperly charged by them to cost of service in their accountings under the public control act was not shown on demurrer to have been barred by the statute of limitations where the averments of the bill did not disclose that the suit was not brought within the statutory period after an alleged breach of the statute by reason of such charges had been, or should have been, discovered by the public authorities.

The trustees of the Boston Elevated Railway Company are not required during the period of public control to keep their books in conformity with regulations of any governmental agency which are directed to privately owned and operated railway systems.

An averment in a bill in equity by members of the department of public utilities against the trustees of the Boston Elevated Railway Company under Res. 1941, c. 89, that the trustees had no power to use the straight line method of depreciation in their accountings, stated no ground for relief; nor did an averment that the trustees did not have an appraisal made of the company's property when they took possession on July 1, 1918, and did not ascertain by an examination of the property the amount that it had been depreciated.

In their accountings under the public control act, the trustees of the Boston Elevated Railway Company were not without power to include as items of cost of service depreciation of viaducts and elevated structures.

A demurrer to a bill in equity properly was overruled where sufficient grounds for relief were averred although the bill included some paragraphs dealing with matters concerning which no relief could be granted: the demurrer must be treated as a unit.

INFORMATION IN EQUITY, filed in the Superior Court on January 26, 1942, and afterwards amended, against the trustees of the Boston Elevated Railway Company and that corporation.

A petition by the city of Boston for leave to intervene was allowed.

A demurrer by the Boston Elevated Railway Company was heard by *Forte,* J., by whose order an interlocutory decree overruling the demurrer was entered, and who reported to this court "for determination the questions raised by the causes of demurrer therein set out, the said interlocutory decree overruling said demurrer to be affirmed, modified or reversed."

*R. H. Holt,* (*T. W. Cousens* with him,) for Boston Elevated Railway Company.

*J. K. Collins,* Assistant Attorney General, for the Attorney General.

*J. W. Kelleher,* Assistant Corporation Counsel, for the city of Boston.

RONAN, J. This is an information in equity, alleged to have been brought in accordance with Res. 1941, c. 89, by the Attorney General in his own name as such officer against the trustees of the Boston Elevated Railway Company appointed under Spec. St. 1918, c. 159, as amended, and against the Boston Elevated Railway Company, seeking a declaratory decree as to the manner in which the trustees should keep the books, accounts and balance sheets of the company and defining the authority of the said trustees to include certain charges as a part of the cost of service rendered by the company under their management and operation, and praying for an injunction to restrain the trustees from charging in the future against the cost of service such items as may be determined in this suit to be beyond their authority to charge. The demurrer of the Boston Elevated Railway Company was overruled in the Superior Court, and the judge reported to this court the questions raised by the demurrer.

We summarize the material allegations of the information. The Boston Elevated Railway Company, hereinafter called

the company, raised $3,000,000 by an issue of preferred stock, $1,000,000 of which was used to create a reserve fund for the purposes mentioned in Spec. St. 1918, c. 159, hereinafter called the public control act, and the balance was by said act put at the disposal of the public trustees, hereinafter called the trustees, for the purchase of additions and improvements. When the trustees took over the management and operation of the company on July 1, 1918, a substantial part of its property, especially the surface tracks, roadbed and cars, was not in good operating condition due to the failure of the company to make necessary repairs and to make provision for depreciation and obsolescence. The cost of much of the property, the use of which had been abandoned, continued to appear on the books of the company and was in excess of the amount of the depreciation reserve shown as "Accrued Depreciation," and, if an equal annual charge for depreciation had been made, the total accrued depreciation unprovided for by the company would have exceeded $22,000,000 and consequently the books and accounts of the company on July 1, 1918, did not reflect the true financial condition of the company.

The trustees have continued the books and accounts of the company, and have failed to write off from the road and equipment accounts amounts carried therein on account of property retired from service prior to July 1, 1918. The trustees have failed to revise the balance sheet of the company to show the accrued depreciation which had not been provided for by the company, and to keep the books of the company in such manner as to show the true financial condition of the company.

The trustees between July 1, 1918, and December 31, 1923, charged to the cost of service as maintenance expense $154,460.75 for tracks, some of which had been discontinued by the company and the rest by the trustees, and none of which had been replaced. Such charge was not necessary in order to put and maintain the property of the company in good operating condition and to return it to the company in that condition, and was contrary to the

uniform system of accounts prescribed by the interstate commerce commission and the department of public utilities although the trustees purported to follow such systems of accounts.

The trustees have from time to time during the period of public control charged to the cost of service as current maintenance expense large amounts representing expenditures made by them on account of deferred maintenance which arose from the failure of the company to repair and renew tracks and roadbed when necessary. They have charged to the cost of service as current maintenance large amounts representing capital expenditures incurred for the cost of replacement of major units and for betterments of property, consisting principally of cars, on account of which depreciation allowances were being made.

Large allowances for depreciation of structures, cars, plant and equipment, not computed on actual depreciation but calculated to produce amounts necessary to purchase new property or deemed necessary to build up a reserve for depreciation sufficient to absorb the depreciation accrued and unprovided for by the company upon property retired before July 1, 1918, were charged to the cost of service between this latter date and December 31, 1921. During the period of public control, the money received on account of charges to the cost of service for the depreciation of structures, cars, power plant and equipment was credited in the balance sheet in the account "for" accrued depreciation or reserve for depreciation together with money received from the salvage of retired property. These moneys were not held as a fund but were spent for general company purposes, including additions and improvements to property, as well as for replacing property retired from service. The trustees have charged to the account "Accrued Depreciation" over $17,500,000, which represents depreciation accrued and unprovided for by the company prior to July 1, 1918. Losses from the sales of land and costs of experimental work done prior to 1894, amounting to $916,756.44, have also been charged to this account. After deducting $616,323.98, the balance in this account on July 1, 1918, as shown by the

books, the sum of $17,800,000 has been charged to this account on account of depreciation accrued prior to July 1, 1918. Up to December 31, 1939, over $34,400,000 has been charged to this account although the balance on this last mentioned date as shown by the books amounted to $16,654,629.49. The total charged for depreciation exceeded the amount necessary for putting the property in good operating condition, so maintaining it, and returning it at the expiration of public control, by at least $17,800,000, an amount that was derived from annual charges for depreciation and was included in the cost of service.

The trustees up to January 1, 1922, included in the cost of service allowances purporting to be for depreciation, but which bore no reasonable relation to the extent of depreciation and were allowances made to secure funds to purchase property considered by the trustees to be desirable for the operation of the railway system; and since the last date they have charged against the cost of service allowances based upon the straight line method of computing the depreciation without considering the necessity for such allowances for operating and maintaining the property in good operating condition and returning it to the company in that condition at the expiration of public control. The trustees have also charged to the cost of service allowances for depreciation on elevated structures and viaducts, property alleged to be nondepreciable.

The Commonwealth at the time it made deficiency payments did not know that the amounts of these deficits included charges for depreciation of the character above recited. Unless these practices of the trustees are corrected, the property of the company will be returned in good operating condition together with additions and betterments from money derived from the cost of service, contrary to the provisions of § 13 of the public control act; and unless the trustees are enjoined from continuing to make similar charges for depreciation, the Commonwealth will have no adequate remedy for the recovery of such excessive charges to the cost of service. The practices of charging these various items to the cost of service were not known at the time

ATTORNEY GENERAL *v.* TRUSTEES, BOSTON EL. RY. [319

deficiency payments were made. These deficit payments have been excessive and illegal, the public has thereby suffered great injury and damage, and the company has received and will receive benefits beyond the compensation fixed by the public control act for the use of its property.

All these allegations must be considered with reference to the public control act, as amended, for the action of the trustees which is challenged cannot be set aside unless it is shown to have transcended the limits of the statutory authority conferred upon them. We must therefore briefly examine the statutory background of the present controversy. Special Statute 1918, c. 159, the original public control act, was accepted by the stockholders of the company and the West End Street Railway Company. [1] Under § 1 a board of five trustees appointed by the Governor was created, and they on July 1, 1918, in accordance with § 2, took over the management and operation of the property of the company on behalf of the Commonwealth for a period of ten years, and were authorized to exercise all the rights and powers of the company and its directors and to receive and disburse the income of the company from the operation of the company's property. The trustees had the right to regulate and fix fares and to determine the character and extent of service. In the operation of the company the trustees were to "be deemed to be acting as agents of the company and not of the commonwealth." They were empowered by § 3 to make contracts on behalf of the company, to issue stocks, bonds and other evidences of indebtedness of the company, and to declare and pay dividends on the stock of the company. The stockholders by § 4 were entitled to elect a board of directors whose principal function was to maintain the corporate organization, but the directors during the period of public control were to have no control over the management and operation of the company. The company by § 5 was required to provide $3,000,000 by the issue of

[1] On June 10, 1922, the Boston Elevated Railway Company and the West End Street Railway Company were consolidated in accordance with St. 1911, c. 740.

preferred stock, $1,000,000 of which was to be set aside as a reserve fund for purposes hereinafter mentioned and the balance, $2,000,000, was to be used by the trustees for the cost of additions and improvements to the property of the company. The trustees were authorized to include in the cost of service certain items enumerated in § 6. The method to be adopted by the trustees in establishing a rate of fares sufficient to pay the cost of service was designated by § 7. It was provided by § 8 that the reserve fund of $1,000,000 should "be used only for the purpose of making good any deficiency in income as provided in section nine or for reimbursing the commonwealth as provided in sections eleven and thirteen" and until such use might be invested by the trustees. The reserve fund in accordance with § 9 was to be used so far as necessary to make up the deficiency when the income of the company was insufficient to meet the cost of service, but when the income exceeded this cost the excess was to be added to the reserve fund. Section 10 governed the charging of fares by the trustees. Section 11 provided that if on the last day of June, 1919, or the last day of any December or June thereafter,[1] the amount in the reserve fund was insufficient to meet the "deficiency mentioned in section nine," the trustees should notify the Treasurer and Receiver General of the Commonwealth of the amount of the deficiency, less the amount, if any, in the reserve fund, and "the commonwealth shall thereupon pay over to the company the amount so ascertained." If on the dates referred to the reserve fund should exceed $1,000,000, the trustees were to pay over the excess, so far as might be necessary, to reimburse the Commonwealth for amounts previously paid by the Commonwealth, which should be distributed by the Commonwealth among the cities and towns in the proportion that they had contributed to the payment of the deficiencies as provided in § 14. By § 12 it was provided that the period of public control

---

[1] The dates, as of which amounts to be paid or repaid on account of deficits shall be determined, have been changed to be as of the last day of March in any year subsequent to 1934 including 1941 and thereafter as of the last day of December, 1941, and as of the last mentioned date in any year after 1941. St. 1941, c. 139.

might at the election of the Commonwealth continue after the expiration of the ten year period. The trustees were directed by § 13 to maintain the property in good operating condition and to make provision for depreciation, obsolescence and rehabilitation so that, upon the expiration of the period of public management and operation, the property would be in good operating condition. If at the time public control ended the reserve fund should be less than $1,000,000, the Commonwealth was directed to pay to the company an amount sufficient to restore the fund to this amount, but if the fund then should be in excess of $1,000,000 this excess was to be paid to the Commonwealth and distributed by it among the cities and towns in the same proportions in which they were liable for assessments for deficiencies. Section 14 provided for assessments upon certain cities and towns for the amounts paid by the Commonwealth for deficiencies under §§ 11 and 13. Sections 15, 16 and 17 are not material to the present inquiry. It was expressly provided by § 18 that none of the provisions of the public control act should be construed to constitute a contract binding upon the Commonwealth other than the provisions that define the terms and conditions under which the property of the company should be managed and operated by the trustees and the provisions of § 13, "which provisions shall constitute a contract binding upon the commonwealth."

The period of public control was extended and further provisions were made by the amendment of the public control act, Spec. St. 1918, c. 159, by St. 1931, c. 333. The changes made by this last statute, in so far as they affect the questions now in issue, will be presently pointed out.

The constitutionality of the public control act, the nature of the relationship thereby created between the Commonwealth and the company, the relationship of the trustees to both, and the duties of the trustees with reference to certain particular matters, have frequently been before the Federal courts and this court, and the provisions of the act have been the subject of many advisory opinions of this court. *Opinion of the Justices,* 231 Mass. 603. *Boston* v.

*Treasurer & Receiver General,* 237 Mass. 403. *Chelsea* v. *Treasurer & Receiver General,* 237 Mass. 422. *Opinion of the Justices,* 261 Mass. 523. *Opinion of the Justices,* 261 Mass. 556. *Opinion of the Justices,* 293 Mass. 589. *Boston Elevated Railway* v. *Commonwealth,* 310 Mass. 528. *Auditor of the Commonwealth* v. *Trustees of Boston Elevated Railway,* 312 Mass. 74. *Boston* v. *Jackson,* 260 U. S. 309. *Helvering* v. *Powers,* 293 U. S. 214. *Boston Elevated Railway* v. *Commissioner of Internal Revenue,* 131 Fed. (2d) 161. *Boston Elevated Railway* v. *Malley,* 24 Fed. (2d) 758.

The gist of the allegations contained in the information apart from the method of keeping the books and accounts of the company is that the trustees were not authorized in some instances to include certain charges in the cost of service, as defined by § 6 of the public control act, and that in other instances charges to the cost of service were excessive, unreasonable and arbitrary. We take the allegations at their face value in determining their sufficiency when challenged by a demurrer. The question is not as to the adequacy of evidence to prove the alleged conduct of the trustees but is whether, assuming the allegations to be true, the information sets forth a cause of action. *O'Brien* v. *O'Brien,* 238 Mass. 403, 410. *Friedman* v. *Connors,* 292 Mass. 371, 376. *Daddario* v. *Pittsfield,* 301 Mass. 552, 556. *Moriarty* v. *King,* 317 Mass. 210.

The principal specific complaints of the Attorney General and of the city of Boston, which was allowed to intervene, are that the trustees have without right charged to and included in the cost of service large amounts for depreciation which had accrued on property retired before they took over the management and operation of the company on July 1, 1918; that charges to the cost of service for depreciation have been made which were not made upon any estimates of actual depreciation of the property but were made for the purpose of securing funds to purchase new capital assets or for the purpose of building up a reserve for depreciation; that the charges for depreciation were in excess by several million dollars of the amounts necessary to restore and maintain the property in good operating condition and

to return it to the company in that condition — which was all that the trustees were required to do — and will give to the company, in addition to its property in this condition, additions and improvements constituting capital assets, which were provided by the trustees without right from the operating revenue of the company; and that such charges have adversely affected not only the amounts due as deficiency payments by the Commonwealth but also the interests of the Commonwealth in the reserve fund.

The company does not now contend that the court has no jurisdiction to grant a declaratory judgment or decree if sufficient grounds for relief in equity are alleged; but it contends that the information sets forth no case for relief in equity, that nothing is shown calling for relief with respect to any matters alleged to have occurred prior to 1941, that the court has no power to enjoin the trustees with respect to any future acts, that the Attorney General has no right to bring these proceedings in his own name, and that certain allegations are too indefinite and vague to require an answer.

The question of the right of the Attorney General to maintain this information in equity in his own name and without any averment that it is brought on behalf of the Commonwealth or any department thereof is raised by the company. The information alleges that it is brought "pursuant to Resolves of 1941, c. 89." No one contends that this allegation is sufficient to make parties to the proceeding those who have not been named as parties, but the Attorney General contends that he is authorized in his own name to bring and maintain the information. The Attorney General represents the public interest, and as an incident to his office he has the power to proceed against public officers to require them to perform the duties that they owe to the public in general, to have set aside such action as shall be determined to be in excess of their authority, and to have them compelled to execute their authority in accordance with law. A petition for mandamus is the remedy usually resorted to in such instances. *Attorney General* v. *Boston*, 123 Mass. 460. *Attorney General* v. *Suffolk County*

*Apportionment Commissioners*, 224 Mass. 598, 610. *Attorney General* v. *Secretary of the Commonwealth*, 306 Mass. 25, 30. *Hobart* v. *Commissioner of Corporations & Taxation*, 311 Mass. 341, 346.

The Attorney General may also bring an information in equity in order to protect the public interest, but it has been generally held in this Commonwealth that, in the absence of a statute, his authority in this respect is restricted to the abatement of public nuisances such as obstructions or encroachments in the public ways or lands or navigable waters, and to the protection of the public interest under charitable trusts. *Attorney General* v. *Tudor Ice Co.* 104 Mass. 239, 244. *Attorney General* v. *Parker*, 126 Mass. 216, 219. *Attorney General* v. *Tarr*, 148 Mass. 309, 314. *Attorney General* v. *Pitcher*, 183 Mass. 513, 520. *Attorney General* v. *Boston & Albany Railroad*, 246 Mass. 292, 296.

The management and operation of the railway system by the trustees on behalf of the Commonwealth in order to furnish transportation for hundreds of thousands of people living in Boston and various cities and towns in the vicinity were undertaken by the Commonwealth through a contractual arrangement with the company. "The Legislature, however, did not purport by the Public Control Act to take or to authorize the taking of possession of the properties of the company or the subsequent management and operation thereof by virtue of any sovereign power other than the power to enter into a contract with the company for the carrying out of a public purpose." *Boston Elevated Railway* v. *Commonwealth*, 310 Mass. 528, 577. The Commonwealth could sue for a breach of this contract, *Attorney General* v. *Gardiner*, 117 Mass. 492, *Attorney General* v. *Williams*, 140 Mass. 329; and it might maintain an action brought in its own name by the Attorney General to recover money due it. G. L. (Ter. Ed.) c. 12, § 5. *Commonwealth* v. *Haupt*, 10 Allen, 38. *Commonwealth* v. *Davis*, 284 Mass. 41. The immediate purpose of the present proceeding is not to recover any money due the Commonwealth but to obtain a declaratory decree and injunctive relief

with reference to certain items alleged to have been wrongfully and illegally charged to the cost of service and by this proceeding to lessen the amounts payable by the Commonwealth. The Legislature could delegate to a State department the duty of securing an adjudication upon such matters, and it could prescribe the procedure to be followed in obtaining such a determination and also confer jurisdiction upon the courts to hear and determine the question. *Selectmen of Gardner* v. *Templeton Street Railway*, 184 Mass. 294. *Attorney General* v. *New York, New Haven & Hartford Railroad*, 197 Mass. 194. *Western Union Telegraph Co.* v. *Foster*, 224 Mass. 365, 367. *Department of Public Utilities* v. *Trustees of New York, New Haven & Hartford Railroad*, 304 Mass. 664, 670. *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 195.

The department of public utilities was authorized by Res. 1941, c. 89, to expend under the direction of the Attorney General an amount not exceeding a certain sum, which was appropriated by the said resolve, "for the purpose of bringing a proceeding at law or in equity seeking a declaratory judgment, order or decree interpreting the provisions of" the public control act, as amended, relative to the authority of the trustees "to make certain charges to the cost of service and their accounting duties incidental to such charges, or such other proceeding at law or in equity as said department and the attorney general deem advisable for the purpose of having a judicial determination of the [said] powers and duties of said trustees . . . . The supreme judicial court and the superior court shall have concurrent jurisdiction of any proceeding brought under authority of this resolve." The names in which the proceedings are to be brought are not expressly designated, but are necessarily implied by the terms of the resolve. The funds appropriated are to be expended by the department of public utilities in bringing the proceedings to settle certain powers and duties of the trustees. The expense to be incurred is that of the department. The money was appropriated for the benefit of the department and to enable it to perform the duty imposed upon it. It was not

intended by the Legislature that these funds should be expended by any other department. *Baker* v. *Commonwealth*, 312 Mass. 490, 493. The responsibility of the department of public utilities for the expenditure of the appropriation was not lessened because it was to be expended under the direction of the Attorney General. The proceedings to be taken to secure a declaratory judgment or decree rested with the department alone; but if some other form of proceeding was deemed advisable, then that form was to be in accordance with the judgment of the department and the Attorney General. The proceedings, however, were to be those of the department of public utilities, and they were to be prosecuted by the Attorney General representing the department. G. L. (Ter. Ed.) c. 12, § 3. Although the real party in interest is the Commonwealth, the Legislature authorized the department to bring the proceedings and conferred jurisdiction upon this court and the Superior Court to hear and decide the case. The resolve did not authorize the Attorney General to proceed in his own name or at the relation of the department. The proceedings were to be brought by the members of the department, or a majority of them, in their official capacity as constituting or representing the department. See G. L. (Ter. Ed.) c. 159, § 40; *Department of Public Utilities* v. *Trustees of New York, New Haven & Hartford Railroad,* 304 Mass. 664. The Attorney General may apply to the Superior Court for leave to substitute the members of the department as the plaintiffs and to make the necessary changes to convert the information into a bill in equity. We consider the case upon the assumption that such an amendment will be allowed. *Bauer* v. *Mitchell*, 247 Mass. 522, 526. *Attorney General* v. *Henry*, 262 Mass. 127, 130, 131. *Building Commissioner of Medford* v. *C. & H. Co.,* ante, 273, 285.

The power of the trustees to make certain charges to the cost of service must be determined by the statute which confers upon them authority to make such charges. A statutory board has only such authority as is expressly given by the statute or is impliedly granted as reasonably

necessary for the performance of its duties. *Kilgour* v. *Gratto,* 224 Mass. 78. *Duffey* v. *School Committee of Hopkinton,* 236 Mass. 5. *Commonwealth* v. *McFarlane,* 257 Mass. 530. *Sweeney* v. *School Committee of Revere,* 249 Mass. 525. *Graves* v. *School Committee of Wellesley,* 299 Mass. 80.

The elements that are to be included in the cost of service rendered to the public while the railway is operated under the management of the trustees are enumerated in § 6 of the public control act, which provides that the cost of service "shall include operating expenses, taxes, rentals, interest on all indebtedness, such allowance as they may deem necessary or advisable, for depreciation of property and for obsolescence and losses in respect to property sold, destroyed, or abandoned, all other expenditures and charges which under the laws of the commonwealth now or hereafter in effect may be properly chargeable against income or surplus, fixed dividends on all preferred stock of the company . . . and dividends on the common stock" at certain rates. The property of the company is to be maintained in good operating condition by the trustees in accordance with § 13, and they are to "make such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public management and operation, the property shall be in good operating condition."

The trustees doubtless possess broad discretionary powers in determining the allowances for depreciation and obsolescence that should be included in the cost of service and the amount that should be expended for the rehabilitation of the property. They were in charge of the management of the company and the conduct of its business of furnishing transportation to the public. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403. *Adams* v. *Eastern Massachusetts Street Railway,* 257 Mass. 115. It is urged by the company that the instant case comes within the general rule that a court of equity will not supervise the exercise of discretionary powers conferred by law upon public officers in the performance of their official duties. This court has always refused to substitute its judgment for that of public

officers when they are acting within the scope of the author-ity that the law has entrusted to them even if they might have made a different and wiser decision. *Morley* v. *Police Commissioner of Boston,* 261 Mass. 269, 278. *Dupuis* v. *Reed,* 289 Mass. 365. *Mullholland* v. *State Racing Commission,* 295 Mass. 286, 291. *Opinion of the Justices,* 300 Mass. 596. *Stretch* v. *Timilty,* 309 Mass. 267, 270, 271. But the conduct of public officers, directly impairing the pecuniary or proprietary interest of another, which tran-scends the limits of discretion and becomes arbitrary and capricious, or conduct which transgresses the bounds of power possessed by them may be set aside, vacated or otherwise adjudged to be of no force and effect. *Stiles* v. *Municipal Council of Lowell,* 233 Mass. 174, 182. *Sweeney* v. *School Committee of Revere,* 249 Mass. 525, 530. *Jaffarian* v. *Mayor of Somerville,* 275 Mass. 264, 266. *Graves* v. *School Committee of Wellesley,* 299 Mass. 80. *Farrell* v. *Mayor of Revere,* 306 Mass. 221. *Sesnovich* v. *Board of Appeal of Boston,* 313 Mass. 393, 398. *Perkins* v. *School Committee of Quincy,* 315 Mass. 47. The same thought is expressed in *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 417, 418, in discussing the specific amounts for depreciation to be charged by the trustees to the cost of service: "Their conclusion would not be set aside unless unsupported in law." It was said in *Opinion of the Justices,* 309 Mass. 609, 626, 629, that the obligation of the Com-monwealth under § 11 of the public control act to pay over to the company "the amount so ascertained" by the trustees "does not purport to deprive the Governor and the Council of reasonable opportunity to inform themselves whether the proposed payment is in accordance with the law," and that "the amount so ascertained" by the trustees "refers to the amount so ascertained in accordance with statutory authority, and not to an amount ascertained by the trustees as stated in the notification regardless of their statutory authority with respect to the elements upon which such amount is based."

Although the trustees may for some purposes be con-sidered to be public officers, *Opinion of the Justices,* 261

Mass. 523, 542, 543; *Auditor of the Commonwealth* v. *Trustees of Boston Elevated Railway*, 312 Mass. 74, 79, in the present instance they are acting as agents of the company concerning a matter covered by a contract between the company and the Commonwealth, and their authority to make the charges against the cost of service arises out of the contract, the interpretation of which is an appropriate subject for a declaratory decree. *Marcelle, Inc.* v. *Sol. & S. Marcus Co.* 274 Mass. 469. *Friedman* v. *S. S. Kresge Co.* 290 Mass. 114. *Mutual Paper Co.* v. *Hoague-Sprague Corp.* 297 Mass. 294. *Radio Corp. of America* v. *Raytheon Manuf. Co.* 300 Mass. 113. *R. H. Stearns Co.* v. *Anderson,* 304 Mass. 138. See now St. 1945, c. 582. Furthermore, the Commonwealth may resort to equity for specific performance of its contract with the company and to require the trustees, the agents of the company, to make no charges against the cost of service other than those authorized by the public control act. *Sanford* v. *Boston Edison Co.* 316 Mass. 631, 634. *Friend Brothers, Inc.* v. *Seaboard Surety Co.* 316 Mass. 639, 645. The allegations are sufficiently definite and certain and set forth an appropriate case for an adjudication of the right of the trustees to charge the cost of service with the items of depreciation in question. Whether an injunction should be granted cannot be decided until the suit has been heard on the merits. It would not necessarily follow that if the decision were against the trustees an injunction should issue. It is ordinarily to be assumed that public officers will comply with the law, when that is determined, without the invocation of coercive measures. *Decatur* v. *Auditor of Peabody,* 251 Mass. 82. *Davis* v. *Retirement Board of the County of Middlesex,* 312 Mass. 115. *Hinckley* v. *Retirement Board of Gloucester,* 316 Mass. 496. Compare *Commonwealth* v. *Hudson,* 315 Mass. 335. We do not intimate that a declaratory decree cannot include injunctive relief. Borchard, Declaratory Judgments (2d ed.) 432. Anderson, Declaratory Judgments, § 96. All we now decide is that a prayer for an injunction does not render defective a bill that adequately sets forth a cause of action.

The trustees are expressly authorized by § 6 of the public

control act to include allowances for depreciation and obsolescence in the cost of service. The meaning of each of these terms is well understood, and so are their nature and purpose. Regard must be given to the matter of depreciation in ascertaining the financial condition of a going concern. *Thurston* v. *Hamblin*, 199 Mass. 151, 158. *Stein* v. *Strathmore Worsted Mills*, 221 Mass. 86, 89. *Lapham* v. *Tax Commissioner*, 244 Mass. 40, 45. *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 613. *Arey* v. *George Associates, Inc.* 299 Mass. 130, 131, 132.

Depreciation represents the consumption of physical assets, resulting from the manufacture of goods or the furnishing of services, which is not restored by current maintenance in making repairs or by the substitution of new minor or small parts which have become worn. Depreciation is the deterioration of physical assets due to wear and tear, decay and age. Another form of depreciation is obsolescence. This we understand to mean a loss in the service value of a fixed or capital asset which has become useless or inefficient on account of advances in the art, new inventions, inadequacy, the shifting of business centers, the loss of trade or some governmental ruling. *Kansas City Southern Railway* v. *United States*, 231 U. S. 423, 451, 452. *V. Loewers Gambrinus Brewery Co.* v. *Anderson*, 282 U. S. 638. *Burnet* v. *Niagara Falls Brewing Co.* 282 U. S. 648. *United States Cartridge Co.* v. *United States*, 284 U. S. 511. *Real Estate-Land Title & Trust Co.* v. *United States*, 309 U. S. 13. Nothing in this opinion depends on any distinction between these forms of depreciation. We refer to both as depreciation. The service life of a machine or plant is shortened by use, and the depreciation if correctly estimated and properly entered upon the books will reflect the lessened value of this capital asset. This lessened value which has occurred in a year is the basis for making a charge against income for annual depreciation as a part of the operating expenses. The purpose and methods for keeping accounts of depreciation and also reserves for depreciation have been frequently stated in decisions dealing with reviews of rate making controversies. See *Smith* v. *Illinois Bell Telephone Co.* 282 U. S.

133; *Lindheimer* v. *Illinois Bell Telephone Co.* 292 U. S. 151, 167; *State* v. *Tri-State Telephone & Telegraph Co.* 204 Minn. 516; *State* v. *Public Service Commission,* 326 Mo. 751, 767; *Wisconsin Telephone Co.* v. *Public Service Commission,* 232 Wis. 371.

As far as possible, a customer ought not to be charged with depreciation as a part of the service to him where the depreciation did not arise from the production of that service but had occurred years previous thereto. The charge for depreciation as a part of the cost of service is at best only an estimate. If enough is not charged the company furnishing the service must bear the loss, but if too much is charged the customers have been compelled to contribute to the capital investment of the company. The purpose of a charge for depreciation is to protect the integrity of the investment, and the cost of service ought not to be burdened with any item that yields the company more than is required to offset the loss due to depreciation.

The power granted to the trustees is not as broad as that possessed by the managers of a privately owned and operated corporation furnishing public transportation where the power of control is limited only by the restrictions imposed on property affected by a public use. The revenues received are the sole property of such a privately owned and managed corporation. It was said in *Public Utility Commissioners* v. *New York Telephone Co.* 271 U. S. 23, 31–32, in which it appeared that the company had in prior years charged excessive amounts to depreciation expense and so created in the reserve account a balance greater than required to maintain the property, and where an attempt was made to compel the company to apply a part of the money represented by this balance to overcome deficits in future earnings, that the relation between the company and its customers was not that of partners, agent and principal, or trustee and beneficiary (citing *Fall River Gas Works Co.* v. *Gas & Electric Light Commissioners,* 214 Mass. 529, 538), that the revenue received by the company belonged to it, that the law did "not require the company to give up for the benefit of future subscribers any

part of its accumulations from past operations," and that payments made by the customers did not give them "any interest, legal or equitable, in the property used for their convenience or in the funds of the company." The contractual rights of the Commonwealth created by the public control act must be respected by the company and by its agents, the trustees. The control act in effect was a lease by the company to the Commonwealth whereby the possession and control of the company's property were turned over to the trustees on behalf of the Commonwealth in consideration of the guaranty of the Commonwealth that the operating revenue would be sufficient to pay all the items enumerated in § 6 of the public control act and in further consideration that the property of the company would be put in good operating condition and so maintained and returned to the company at the expiration of public control. This was a part of the compensation to be paid for the use of the property. That the arrangement between the Commonwealth and the company may in some aspects be regarded as a lease is indicated by the title of St. 1931, c. 333, which reads as follows: "An Act revising and extending the term of the lease to the commonwealth of the properties of the Boston Elevated Railway Company and continuing public management and operation thereof." The contractual relation created by the public control act has been frequently referred to as a lease. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 415–416. *Opinion of the Justices,* 261 Mass. 523, 541. *Opinion of the Justices,* 293 Mass. 589, 595. It is not an uncommon provision for a lessee to undertake the renovation of the demised premises and to make alterations at his own expense, and to return the premises in a certain condition. *Cawley* v. *Jean,* 218 Mass. 263. *Ginsburg* v. *Jacobson,* 276 Mass. 108. *Codman* v. *Hygrade Food Products Corp.* 295 Mass. 195. Here the Commonwealth agreed to rehabilitate the property, and to maintain and return it to the company in good operating condition. Both the company and the Commonwealth must be taken to have understood that the property was in poor operating condition and to have entered into

the contract with that situation in mind. The company had furnished $2,000,000 for new capital improvements, and the Commonwealth agreed that the revenue would be sufficient to enable the trustees to put the property in proper operating condition and to make up any deficiency if the revenue and the reserve fund proved to be inadequate for that purpose. Charges to cost of service to procure money which was expended by the trustees for this purpose was authorized by § 6 when read in conjunction with § 13, and this would be true whether the charges were made ostensibly for depreciation or under some other heading, provided the money was used to put the property in good operating condition. The trustees were authorized to charge the service with the amounts necessary for this purpose. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 417. *Adams* v. *Eastern Massachusetts Street Railway,* 257 Mass. 115, 132. But once put in this condition, a charge for current maintenance and for annual depreciation could properly be made to the cost of service for the replacement of capital assets consumed in the service furnished by the company while under public management and operation. Other than by the fact that the financial condition of the company might be improved by restoration and return of its property in this condition, the Commonwealth did not agree to rehabilitate the financial condition of the company. It would take plain language in a lease to impose an obligation on a lessee to pay any previous losses that a landlord had sustained with reference to the demised premises. Excepting the expenses paid for putting and maintaining the property in good operating condition, the trustees were without power to charge to the cost of service the amounts alleged in the information for the purpose of offsetting the loss which it is alleged the company had sustained with reference to capital assets retired before the lease became effective or to charge for depreciation accrued on the property prior to the time they took over the possession and management. The Commonwealth did not agree to reimburse the company for capital losses which had occurred years before July 1, 1918. The relation

of past capital losses sustained by a public utility to its present operating revenue is shown where unsuccessful attempts have been made to include such losses in the rate base for the purpose of fixing the rates to be charged the public. *Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, 14. *Galveston Electric Co.* v. *Galveston*, 258 U. S. 388, 395. *Georgia Railway & Power Co.* v. *Railroad Commission*, 262 U. S. 625, 632. *Federal Power Commission* v. *Natural Gas Pipeline Co.* 315 U. S. 575, 590. Here we do not think that the Legislature intended that past capital losses incurred by the company prior to July 1, 1918, other than amounts required for the said rehabilitation and maintenance of the property in accordance with § 13 of the public control act, should be charged to the cost of service.

It is, however, pointed out that under § 6 of the public control act the trustees may charge against the cost of service losses on account of property lost, destroyed or abandoned. This we think refers to property that has been lost, destroyed or abandoned during the period of public control. Finally, the provision in § 6 authorizing the trustees to include in the cost of service "all other expenditures and charges which under the laws of the commonwealth now or hereafter in effect may be properly chargeable against income or surplus" does not warrant the trustees in reimbursing the company for capital losses which occurred before public management and operation began. See G. L. (Ter. Ed.) c. 161, §§ 115, 116. The operating revenues, after bearing the burden necessitated by putting the property in good operating condition, ought not to be subjected to further charges on account of capital losses which had long ago been sustained by the company. As already pointed out, these losses could not properly be included in fixing the rate to be charged to customers for the services furnished by the company if it remained under private management. Such losses ought not to be included in the notices for payment of deficits presented to the Commonwealth. There does not seem to be any logical relation between them and present income, and it does not seem that on account of such losses the services rendered are made more valuable

or that the passengers receive a benefit which they otherwise would not receive. Reimbursement of the company for past losses was not a part of the rental which the Commonwealth agreed to pay for the use of the property of the company. The power of the trustees to charge expenditures to surplus is not as broad as that enjoyed by managers of privately operated public utilities. The Commonwealth was not bound to make good the losses that had been sustained by the company before the trustees took control, and the rights of the Commonwealth in the reserve fund which will be presently discussed ought not to be impaired on account of the payment of such losses out of either income or surplus. Furthermore, the power of the trustees to make charges to the cost of service, including those for depreciation and property losses, cannot be enlarged with reference to these particular matters by the words "all other expenditures and charges," which must refer to expenditures and charges other than those specifically mentioned in said § 6.

We have already pointed out that the trustees could charge the cost of service for expenditures incurred in rehabilitating the property of the company, assuming that the $2,000,000 furnished by the company for additions and improvements was insufficient for the purpose, and in the face of the allegations of the information we cannot say as matter of law that the amounts alleged to have been charged to the cost of service for this purpose were not unreasonable, excessive or arbitrary, as the information alleges they were. Those amounts were in the first instance to be determined by the trustees, and their judgment cannot be set aside unless it is shown that they could not have acted reasonably and have arrived at the conclusion they did. See *Swan* v. *Justices of the Superior Court,* 222 Mass. 542, 548; *Ott* v. *Board of Registration in Medicine,* 276 Mass. 566, 571; *Rinaldo* v. *School Committee of Revere,* 294 Mass. 167, 169.

The company, having accepted St. 1931, c. 333, contends that the reimbursement by it to the Commonwealth in 1931 in accordance with this statute for all deficiency payments previously made by the Commonwealth constituted a final settlement of all financial matters then pending

between them. It is pointed out that this chapter extended the period of public control to July 1, 1959, reduced the rates of dividends on common stock from six to five per cent, and suspended the operation of § 10 of the public control act which governed the fixing of fares by the trustees; that no deficit payment was required to be made by the Commonwealth for the year ending June 30, 1931; that a special trust fund held by the company for the retirement of the second preferred stock was applied to the reimbursement of the Commonwealth for all deficits paid by it; that the company agreed that, upon the termination of public control, it would not pay dividends on its common stock in excess of six per cent and would become subject to such regulations as to fares and services as the General Court or the department of public utilities might prescribe provided such regulations would not reduce its income below an amount sufficient to pay a dividend at the said rate upon its common stock; and that the company agreed to sell its property and franchise to the Commonwealth at a price computed upon a certain value for its outstanding stock. It is therefore argued that St. 1931, c. 333, wrought such material changes in Spec. St. 1918, c. 159, that a new contract was thereby created; that a new term of the lease began upon the effective day of said c. 333; and that, the Commonwealth having been repaid all that it had paid, the company was not thereafter indebted to the Commonwealth on account of any prior deficit payments.

It is true that the contract between the Commonwealth and the company created by the public control act was modified by said c. 333, but many of the changes consisted of making provisions for new matters not included in the earlier act. Other than providing for the inclusion of additional expense in the cost of service as provided for in § 6 of the public control act, this section was not materially affected by c. 333. We do not agree that the amendment to the public control act by this chapter resulted in the consequences urged by the company. In the first place, this chapter expressly provided by § 19 that none of

its provisions or those of the public control act should be construed to constitute a contract binding on the Commonwealth except (a) the provisions of § 1 of this chapter which extended the term of the lease, (b) the provisions defining the terms and conditions under which the property of the company should be managed and operated by the trustees, (c) the provisions of this chapter giving priority to certain bonds and other evidences of indebtedness of the company, and (d) the provisions of § 13 of the public control act obligating the trustees to put and maintain the property in good operating condition and to return it to the company in that condition, and providing that, if the reserve fund of $1,000,000 should be less than this amount at the termination of public control, the Commonwealth should pay enough to bring it up to said amount, but that if there should be then more than this amount in the fund the company should pay the excess to the Commonwealth. It is also provided by § 20 of said c. 333 that this chapter shall be regarded as amendatory of the public control act and for the purposes of interpretation and construction shall be treated with the earlier act as a single act.   But §§ 6 and 13 of the public control act, which are the most pertinent sections of that act in so far as the present inquiry is concerned, were unaffected by c. 333 in any respect now decisive of the present controversy.   In the next place, the allegations of the information are sufficient to show that the payments made by the Commonwealth before that of March, 1941, which is the first payment that the Commonwealth has failed to pay, were made in accordance with the notices from the trustees that the amounts ascertained by them were due from the Commonwealth and in ignorance of the fact that these amounts included items which were excessive or which the trustees were without power to include in their computation of the deficit.   It is urged that the disbursing officers could not have been ignorant as to the items contained in the amounts stated by the trustees to be due, as the methods of computation of these amounts were disclosed by various reports made by them to the Legislature, and that the Commonwealth, being

engaged in a commercial undertaking, is bound by the general rule barring recovery of payments voluntarily made by one knowing all the facts. But these questions are not open on a demurrer, for all that we are now concerned with is the sufficiency of the information to state a case. We do not intimate that, if the officers of the Commonwealth knew all the facts when the moneys of the Commonwealth were paid, the Commonwealth would be barred from recovering amounts in excess of those that the trustees could lawfully demand. It is well settled that a public officer may pay out public funds only where the law requires or permits him to do so, and that, in making payments not so required or permitted, the act of the officer is not the act of the government but only the unauthorized act of the officer. *Commonwealth* v. *Haupt,* 10 Allen, 38. *County of Norfolk* v. *Cook,* 211 Mass. 390. *Wisconsin Central Railroad* v. *United States,* 164 U. S. 190. *United States* v. *Wurts,* 303 U. S. 414. *New York City Employees' Retirement System* v. *Eliot,* 267 N. Y. 193. *New York Telephone Co.* v. *Board of Education of Elmira,* 270 N. Y. 111. Williston, Contracts (Rev. ed.) § 1590. The amount demanded by the trustees for a payment of a deficiency was not conclusive on the Commonwealth. *Opinion of the Justices,* 309 Mass. 609, 629. The case is distinguishable from those where a public board is authorized to investigate and settle a claim against the government, *Willar* v. *Commonwealth,* 297 Mass. 527, or where the decision of the board is final even if it subsequently appears that an error has honestly been made. *United States* v. *Great Northern Railway,* 287 U. S. 144. *Butte, Anaconda & Pacific Railway* v. *United States,* 290 U. S. 127.

The maintenance of the information is not barred by the statute of limitations. A State is not subject to the statute of limitations unless it consents to be so bound. The Commonwealth has consented to have the six year statute of limitations applicable to actions of contract brought by it. G. L. (Ter. Ed.) c. 260, §§ 2, 18. See *Boston* v. *Nielsen,* 305 Mass. 429, 431. We must ascertain the nature of the claim on behalf of the Commonwealth and the relation

between the Commonwealth and the company in accordance with which deficiency payments were made in order to determine whether the Commonwealth is barred from attacking the validity of the previous demands of the trustees in compliance with which deficit payments were made more than six years ago. These payments were not merely loans to the company, and the relation which they created was not simply that of creditor and debtor. The company was bound to reimburse the Commonwealth on the happening of certain contingencies. Any deficit arising where the cost of service exceeded the earnings and where the reserve fund was inadequate to pay the deficit was to be made good by the Commonwealth, but if the balance in the reserve fund was more than its original amount of $1,000,000 at the annual date fixed for the determination of a deficit then the excess was to be paid to the Commonwealth in so far as was necessary to repay previous deficit payments by the Commonwealth, and if full reimbursement had been made then the excess was to remain in this reserve fund. We do not know what balance, if any, would be in the reserve fund or what deficits or the amounts of them the Commonwealth would have been required to pay if the trustees had not made the charges in question to cost of service. That is a matter that will appear at a trial on the merits. The company would have no right to such overpayments. Neither would it have any rights to any profits that might accrue from the operation of its property by the trustees. The profits would belong to the Commonwealth. It was said in *Opinion of the Justices*, 261 Mass. 523, 550, in deciding that a proposed bill containing a section similar to § 2 of the public control act, which among other things authorized the trustees to receive and disburse the company's income and funds, would be constitutional if enacted into law, that the income was not public income which should be paid into the treasury of the Commonwealth in accordance with art. 63 of the Constitution of Massachusetts, and that the "Profits which may accrue, save as thus restricted, belong to the railway company and not to the Commonwealth." This statement

was accurate in the sense that the income received by the company belonged to it, subject to the rights of the Commonwealth. Profits were not a part of the compensation to be paid by the Commonwealth for the use of the property, and the profits, after the reserve fund amounted to its original sum of $1,000,000, were payable to the Commonwealth at the annual dates fixed for determining whether a deficiency existed in so far as such payments were necessary to reimburse the Commonwealth for previous deficit payments and for the payment to the Commonwealth at the expiration of the period of public control of all this fund in excess of $1,000,000. *Boston Elevated Railway* v. *Commissioner of Internal Revenue*, 131 Fed. (2d) 161, certiorari denied, 318 U. S. 760.

The company, by its contract with the Commonwealth, agreed and undertook to permit the management and operation of its railway system by its agents, the trustees, for the sole benefit of the Commonwealth in so far as the profits were concerned. The company became accountable to the Commonwealth for any deficiency payment received by the company in excess of that which it could demand in accordance with the public control act. The Commonwealth has a beneficial interest in that portion of the income of the company not needed for the payment of the expenditures permitted to be incurred under the public control act, and this excess of income is to be held and applied by the company in accordance with § 13 of this act. Expenditures by the company for unauthorized purposes would constitute a breach of trust, and proceedings brought to make good the loss caused by the breach are not barred by the statute of limitations if brought within the period prescribed by the statute after the Commonwealth knew or ought to have known of the breach. The allegations of the information do not show that the present proceedings were brought after that period. *Gould* v. *Emerson*, 160 Mass. 438. *Old Dominion Copper Mining & Smelting Co* v. *Bigelow*, 203 Mass. 159, 201. *Bowker* v. *Torrey*, 211 Mass. 282. *Moore* v. *O'Hare*, 224 Mass. 283. *Jekshewitz* v. *Groswald*, 265 Mass. 413. *Stuck* v. *Schumm*, 290

Mass. 159. *Zytka* v. *Dmochowski*, 302 Mass. 63. *Akin* v. *Warner*, 318 Mass. 669.

The books kept by the trustees are the books of the company and not of the Commonwealth, *Auditor of the Commonwealth* v. *Trustees of Boston Elevated Railway*, 312 Mass. 74; and while the books should reflect truthfully the transactions of the company, the latter was not required during the period of public control to keep its books in conformity to those regulations of any governmental agency that are directed to privately owned and operated railway systems. The purpose of such regulations is to enable the appropriate public board to learn the nature and value of the assets of the carrier and to discover corporate conduct which might result in the imposition of charges upon the public which would be unreasonable and excessive. Such means of supervision were not deemed necessary in the present case. The Legislature has since 1919 required the trustees to file annual reports of their administration and since 1931 has required them, when requesting the payment of a deficiency, to notify the trustees of the metropolitan transit district and the department of public utilities, which is authorized to make such investigation as it deems proper and to file a report with the Governor which shall be made public. Spec. St. 1919, c. 185. St. 1931, c. 333, § 3. We are not primarily concerned with methods adopted by the trustees in keeping the books of the company. Our inquiry is not so much concerned with what the books show or how certain transactions have been recorded, but rather with what items were included by the trustees in ascertaining the cost of service. The allegations based upon the claim that the trustees had no power to use the straight line method of depreciation state no cause for relief. We have no power to decide what is the best method of accounting with reference to depreciation. The choice lies with the trustees. We cannot say they were wrong in employing the method which they did and which appears from decisions of the Supreme Court of the United States and of this court to be one of the recognized methods of good accounting. *Lindheimer* v. *Illinois Bell Telephone Co.* 292 U. S. 151, 167,

168.   *Lapham* v. *Tax Commissioner,* 244 Mass. 40, 44. *Boston & Albany Railroad* v. *New York Central Railroad,* 256 Mass. 600, 613.   *Waltham Watch & Clock Co.* v. *Waltham,* 272 Mass. 396, 410, 411.   There is no just ground of complaint that the trustees did not have an appraisal made of the company's property when they took possession on July 1, 1918, and did not ascertain by an examination of the properties the amount they had then been depreciated. The theory that the determination of depreciation by observation of the property is preferable to the estimates of experts based upon judgment and experience finds support in *Pacific Gas & Electric Co.* v. *San Francisco,* 265 U. S. 403, and *McCardle* v. *Indianapolis Water Co.* 272 U. S. 400, but it has since been pointed out that one method as matter of law is not entitled to more weight than the other.   See Brandeis, J., dissenting in *United Railways & Electric Co. of Baltimore* v. *West,* 280 U. S. 234, 284, 285; *Federal Power Commission* v. *Hope Natural Gas Co.* 320 U. S. 591, 606, 607.   The trustees were not without power to charge the cost of service with depreciation of viaducts and elevated structures.   It is common knowledge that such structures are subject to deterioration although the rate might be comparatively low.   *Clark's Ferry Bridge Co.* v. *Public Service Commission,* 291 U. S. 227, 239.

Although some of the paragraphs of the information deal with matters concerning which no relief can be granted, yet a demurrer cannot be overruled on one ground and sustained on another because a demurrer must be treated as a unit; and where, as here, sufficient grounds for relief are alleged, the demurrer must be overruled, *Whitmore* v. *International Fruit & Sugar Co.* 214 Mass. 525, 528; *Ratté* v. *Forand,* 299 Mass. 185, 187.

The interlocutory decree overruling the demurrer is to be affirmed if the amendment suggested is allowed in the Superior Court, otherwise the interlocutory decree overruling the demurrer is to be reversed and a decree entered sustaining the demurrer.

*So ordered.*